No. 35,819

THE STATE OF KANSAS on petition of JOSEPH H. McDOWELL, County Attorney of Wyandotte County, *Plaintiff*, v. DON C. McCOMBS, EDWARD G. BECKER and FRANCIS BLAKE, City Commissioners of Kansas City; BERTHA M. JAGGER, City Treasurer; THE CITY OF KANSAS CITY; THE MINNESOTA AVENUE, INC.; and J. W. PERRY, *Defendants*.

(133 P. 2d 582)

Opinion filed January 23, 1943.

*Samuel M. Terbovich*, county attorney, *Thomas E. Joyce*, first·assistant county attorney, and *T. F. Railsback*, special assistant county attorney, of Wyandotte county, argued the cause for the plaintiff.

*Alton H. Skinner*, city attorney, argued the cause, and *Joseph A. Lynch*, deputy city attorney, was on the briefs for the defendants Don C. McCombs, Edward G. Becker, Francis Blake, Bertha M. Jagger, and the city of Kansas City.

*Louis R. Gates*, of Kansas City, argued the cause, and *Ralph M. Russell*, of Kansas City, was on the briefs for defendants Minnesota Avenue, Inc., and J. W. Perry.

*T. M. Lillard*, of Topeka, argued the cause, and *O. B. Eidson, P. H. Lewis*, both of Topeka, *N. E. Snyder*, of Kansas City, and *T. F. Hamer*, of Omaha, Neb., were on the briefs for intervening defendant Union Pacific Railroad Company.

The opinion of the court was delivered by

THIELE, J.: This is an action in the nature of quo warranto, filed originally in this court, to determine the authority of the governing body of Kansas City to enter into a certain contract or lease with The Minnesota Avenue, Inc., for the use of a part of the public levee in that city, and to determine the validity of the lease contract. The original defendants were the city of Kansas City, the members of its governing body, and the city treasurer, any or all of

whom will be referred to hereafter as the city, and who have filed an answer, and The Minnesota Avenue, Inc., and J. W. Perry, who have also answered. The Union Pacific Railroad Company was permitted to intervene and it has also filed an answer. After the issues were thus joined, the original defendants filed their motion to have the court determine certain proposed questions of law in advance of a trial of the facts. This motion was allowed and the matter set for hearing, but before the hearing was had the plaintiff filed some amendments to its petition and a reply to the several answers filed. We shall consider the questions proposed in the light of the issues as finally joined.

Before taking up the specific questions raised we note that the pleadings and the briefs submitted contain much with reference to the history and the legislation of the state insofar as it pertains to the use of levees both generally and in Kansas City, and to what has been done with the levee in Kansas City. Without any intention of making an all inclusive or exhaustive statement, we note the following course of legislation and events. It is conceded that when Wyandotte City, now a part of Kansas City, was originally platted, a certain tract to the west and north of the conjunction of the Missouri and Kansas rivers was dedicated as a public levee, and that in subsequent years by processes of accretion its size increased until it contained a total of approximately 115 acres. We need not note such efforts as were made to put it to use, nor such litigation as was had with respect to the levee prior to 1929. In the latter year the legislature passed two acts affecting public levees. By Laws 1929, chapter 115, appearing as G. S. 1935, 12-672, 12-673, any city was authorized to own, operate and lease out docks, wharves and river terminals, and to improve them for specified purposes, and by ordinance to establish rules and regulations and to employ such agencies as may be needful and proper to carry out the powers granted. Under this act bonds could be issued to pay costs of acquisition or improvement when authorized by a vote of the people. By Laws 1929, chapter 125, appearing as G. S. 1935, 13-1074 to 13-1077 inclusive, any city of the first class having a population of 100,000, owning land abutting upon or adjacent to a navigable stream, was authorized to lease the same. This statute, in general, contemplated improvements should be made by the lessee, the city being authorized to enter into a lease for a term not exceeding ninety-nine years and for such rental and upon such conditions as in the judgment of

the governing body would be to the best interests of the city. It was also provided the lease should reserve to the city the right to establish harbor lines and that the lessee would construct at his own expense certain roads and streets across the levee. Other reservations were made which need not be detailed. Provision was also made that before any improvements were made, detailed plans therefor should be approved by the governing body.

In 1933 three other acts were passed at a special session of the legislature. By Laws 1933 (Special Session), chapter 32, appearing as G. S. 1935, 12-805a to 12-805k, inclusive, municipalities were authorized to sell general revenue bonds to pay the cost of constructing utilities of a revenue producing character. This act defined terms used in it, provided that revenues derived from operation should be paid into the public treasury and should not be used except for paying cost of operation, maintenance and improvement, providing a depreciation fund and paying the principal and interest on the bonds issued, etc. Under certain circumstances, the bonds authorized could be issued without a vote of the electorate, otherwise such a vote was required. Laws 1933 (Special Session), chapter 33, appearing as G. S. 1935, 12-674, is noticed only to state it authorized certain coöperation with the federal government under the national industrial recovery act.

The other 1933 act was Laws 1933 (Special Session), chapter 43, appearing as G. S. 1935, 13-1238 to 13-1245, inclusive. It is the primary act involved in the present controversy. It was an act to authorize cities having a population of 115,000 to issue revenue bonds to pay the cost of improving public levees. This act authorizes the issuance of such bonds without any election or vote of the people, defines revenue bonds as the term is used in the act as bonds issued to be paid exclusively from the revenue produced from the facilities improved, and that such bonds are not general obligation bonds of the city. Sections 5 and 6, of the act (G. S. 1935, 13-1242, 13-1243) are as follows:

"5. Provision shall be made by the governing body of such city for the payment of said bonds, by fixing rates and charges for the use of and the services to be rendered by such property and facilities, which rates and charges so fixed shall be sufficient to pay all expenses of the city in connection therewith and cover the cost of operation and repairs, pay all interest charges upon all indebtedness created for the purpose of improving, constructing, reconstructing, repairing or improving of such public levee and the improvements and facilities thereon for which such revenue bonds were issued to so improve,

construct, reconstruct or repair and to provide a sinking fund sufficient to pay off such indebtedness at maturity.

"6. The governing body of such city, is hereby empowered and authorized to enter into an agreement in writing with any person, firm or corporation to erect and construct on its public levee, improvements and facilities authorized and mentioned in this act and lease the same for a term of not to exceed ninety-nine years for such rental and upon such conditions as in the judgment of said governing body will be to the best interest of such city, provided the rent fixed by any such agreement and lease shall be sufficient to liquidate and pay all .expenses of the city connected therewith and the principal and interest of all revenue bonds issued or to be issued to pay the full cost of such improvements and facilities so leased."

The act (G. S. 1935, 13-1245) further provided in substance it was supplemental to G. S. 1935, 12-673, and not a modification thereof. Two sections of this 1933 act were amended by Laws 1937, chapter 135, appearing as G. S. 1941 Supp. 13-1238, 13-1244, but those amendments do not affect the questions presently before us.

After the enactments of 1933 the city commenced the improvement of the levee. Its first effort was in the nature of a lease to a trustee for the federal government which proposed to make certain improvements, and for certain subleasing by the city. In *State, ex rel., v. Kansas City,* 140 Kan. 471, 37 P. 2d 18, it was held that the city was not authorized to make the particular contract. Later a plan was devised to issue some general obligation bonds to 'be used in connection with funds from the federal government. The bonds were authorized at an election and an action was brought to enjoin the issuance of the bonds. (*Robertson v. Kansas City,* 143 Kan. 726, 56 P. 2d 1032.) One of the objections made was that the improvement had to be made either with proceeds of general obligation bonds or with proceeds of revenue bonds. The injunction was denied, it being held that by reason of G. S. 1935, 13-1245, proceeds from both sources could be used. Thereafter arrangements for construction of improvements were made and another action testing the city's power was filed, *State, ex rel., v. Kansas City,* 148 Kan. 623, 84 P. 2d 409, 149 Kan. 252, 86 P. 2d 476, where, shortly stated, it was held that Laws 1933 (Special Session), chapter 43, as amended by Laws 1937, chapter 135, was not unconstitutional; that the city had power to issue the revenue bonds to pay for the improvements; and that such bonds were not general obligations of the city.

The construction of at least the major part of the contemplated improvements was completed and the city, having enacted an ordi-

nance fixing minimum rentals for various units of the facilities, endeavored to obtain tenants and made certain arrangements to induce such tenants to lease part of the facilities constructed, and thereupon an action was filed in this court to determine validity, which resulted in a judgment for the city. (*State, ex rel., v. Kansas City*, 151 Kan. 2, 98 P. 2d 101.) Thereafter an action was instituted in the United States district court for the western district of Missouri, to enjoin the city and the Union Pacific from proceeding with such arrangements for the asserted reason the Elkins act, U. S. C. A. Title 49, section 41 *et seq.*, was being violated. That action resulted in favor of the plaintiff and in March, 1940, the railroad company and the city were enjoined from carrying out arrangements made. (*United States v. Union Pac. R. Co.*, 32 F. Supp. 917.) On appeal to the supreme court of the United States, some slight modifications were made as to the full extent of the injunction, details of which need not be noticed, and as modified the order of the trial court was affirmed on June 2, 1941. (*Union Pacific R. Co. v. U. S.*, 313 U. S. 450, 61 Sup. Ct. 1064, 85 L. ed. 1453.) The net result of the action in the federal court was that the arrangements whereby the facilities were to be leased largely failed, and a considerable part of the facilities were or became unoccupied and unproductive of revenue needed for the general purposes of maintenance and payment of interest on and retirement of the revenue bonds, the proceeds of the sale of which were used to construct the facilities on the levee. After the injunction was granted in March, 1940, the city set about making new arrangements for obtaining a tenant or tenants for the various units of the facilities on the public levy, and under date of September 12, 1940, it enacted its ordinance No. 31,597, authorizing the mayor to enter into a certain lease contract with The Minnesota Avenue, Inc., the lease being embodied in the ordinance. Later and by ordinance No. 32,322 enacted January 13, 1942, certain portions of the lease were amended, and it is the contract or lease as so constituted that is the subject matter of this action. The lease contract is a long, comprehensive document and we summarize it, detailing only such portions as are particularly assailed in this action.

The lease contract provided that in consideration of covenants to be performed and payments to be made by the lessee the lessor leased to the lessee for a term of one year certain described real estate on the public levee, with the improvements thereon, except the

cold storage and ice manufacturing plant and the portion of the levee occupied by Minnesota avenue extension, and reserving to the lessor the right to itself and the public to use the roadways within the leased premises, and subject to certain leases, agreements and contracts mentioned in section 3 and shown on a schedule attached to the lease contract. Under section 3 the lessor agreed to assign the leases mentioned to the lessee, which agreed to accept the assignment and to relieve lessor from all obligations thereunder. Under section 4 the lessee agreed to pay as rental the entire amount collected by it from tenants and subtenants up to a total of $90,000, also by a series of steps, in substance one-half of the rents from $90,000 to $140,000, all of the rents from $140,000 to $200,000, and one-half of all rents in excess of $200,000, all payments to be subject to deductions for expenses as provided in section 9. In addition the lessee was to collect and pay lessor certain charges for refrigeration, the section further providing:

"The rentals so collected, less the amounts to be retained by the Lessee as hereinbefore provided, shall be remitted by the Lessee to the Lessor not later than the 20th day of each month following the month in which the rentals were collected, and the Lessee agrees to use all reasonable means to effect collection of the rentals provided for in any leases in effect upon the effective date of this lease or in any subleases hereafter made by the Lessee for any portion of the leased premises."

Section 5 need not be noticed. By section 6 provision was made for lessee to give lessor a fidelity bond on employees collecting rents. Under section 7 the lessee agreed to maintain and continuously operate the leased premises for the purpose of operation of the grain elevator terminal dock, and the conduct of the wholesale and jobbing business for handling products of agriculture by highway, pipe line, rail or water transportation, together with all business not prohibited by law and in keeping with the general purposes for which the improvements were constructed, etc., the section concluding with this sentence:

"The Lessee, in the use and occupancy of the leased premises, shall conform in all respects with the laws of the United States and of the State of Kansas with respect to the leased premises."

A portion of section 8 reads as follows:

"The Lessee may by written lease sublet space in the leased premises to subtenants for the purpose of conducting businesses, therein of the nature specified in section 7 hereof, subject however, to the condition that the rates of rental charged by the Lessee to any subtenant shall be not less than the fair rental

value for the facilities occupied and shall comply with the laws of the United States, the decrees of the United States courts and with the requirements of sections 13-1242 and 13-1243 of the General Statutes of Kansas for 1935."

Under section 9 the lessee agreed to require its president to give his personal efforts to the management and operation of the leased premises, the lessee to have the right to purchase and use such materials and supplies as may be necessary in the management, maintenance and operation of the leased premises, the amount so expended being subject to approval of a committee to be appointed as provided. The lease then continues:

"Promptly after the execution and delivery of this lease a committee consisting of three members shall be appointed, one to be appointed by the Lessor, one by the Lessee and one by the holder or holders of more than 50% of the outstanding Public Levee Terminal Revenue Bonds, issued by the Lessor pursuant to Ordinance No. 30-206, and during the term hereof, or any renewal or extension thereof, a committee so comprised and appointed shall be continued. The committee thus appointed shall meet as often as may be necessary for the purpose of determining upon and approving a budget of the maximum amounts of the expenses which the Lessee may expend during each month of the term hereof, or any renewal or extension of said term for the management, maintenance and operation, and the alterations provided for in section 14 hereof, the leased premises, and the allocation of such expenses to the various improvements on the leased premises, and no amount expended by the Lessee in excess of the amount set forth in such approved budget shall be allowable as a deduction from the rentals to be paid by the Lessee to the Lessor as provided in section 4 hereof.

"The Lessee may occupy and use without the obligation to pay rent to the Lessor therefor, office space in said Produce Building D not exceeding Fifteen Hundred (1500) square feet of floor space, for the purpose of conducting the management and operation of the leased premises."

By section 10 the lessee is required to carry adequate insurance against fire, lightning and other specified hazards, as well as public liability insurance. Under section 14 the lessee shall make no alterations, changes or improvements without written consent of the lessor, except it is permitted to make changes costing not to exceed $1,000 to accommodate requirements of tenants. Any improvements made on the leased premises become the property of the lessor and are not to be removed. The lessee agrees that the use and occupancy of the premises shall conform to and comply with all laws applicable. By section 15 it is provided that except as to improvements made under section 2 the lessee shall fully pay for material joined or affixed to the premises and shall pay all labor claims, etc., and shall hold the city harmless on account thereof.

Although expressed in a more detailed manner, under section 19 the lessee is given the option to renew the lease for successive periods up to thirty years on the same terms upon sixty days' written notice before expiration. Other sections of the lease contract, although important, are not set forth as they are not involved in the present controversy.

The petition of the plaintiff contains allegations concerning the public levee and the improvement thereof, and that the improvements were made under the several statutes hereinbefore reviewed, and after alleging execution of the above lease directs particular attention to the formula fixing rents, the provision for deduction of expenses for management, maintenance and operation from the gross rentals, and to the provision that such amounts shall be subject to the approval of the budget committee provided in the lease, then alleges that the rents and revenue derived from the public levee are public funds and subject to accounting as such. It is further alleged that The Minnesota Avenue, Inc., took possession of the levee and has been operating it and that public moneys collected by it have been expended in violation of law in that the budget committee has no authority to make a budget for the expenditure of public moneys; that many of the tenants refused to recognize the present lease and made rental payments to the city, which endorsed the rent checks to The Minnesota Avenue, Inc., and the city did not deposit and pay out public funds as provided by G. S. 1935, 9-302, 9-305, 13-1404, 13-1414, 13-2107; that the lease contract is illegal and void in that it does not fix a definite sum to be paid as rental as required by G. S. 1935, 13-1243; that expenditures of public funds by The Minnesota Avenue, Inc., for purposes provided are illegal and contrary to G. S. 1941 Supp. 13-2108, in that the city auditor does not examine and approve the claims, and are contrary to G. S. 1935, 13-1455, which requires the city purchasing agent to purchase supplies in excess of $1,000 by advertising for bids, and are contrary to G. S. 1935, 13-2109, which requires the city engineer to prepare plans and estimates on all public improvements. There is also allegation that the city wrongfully paid out from revenues derived from the levee four accounts totaling $40,000.88 which were not proper charges, and that by reason thereof the net income is insufficient to pay interest and principal on the revenue bonds and that at the present time there is a default exceeding $100,000, and by reason thereof the city has or may become liable to the holders of revenue

bonds in an amount equal to the funds that have been diverted from the public levee revenues. The prayer is that this court oust the city from recognizing or giving validity to the lease contract and that it oust and enjoin The Minnesota Avenue, Inc., and J. W. Perry from continuing in possession or attempting to exercise the operation of the levee, from collecting or expending any public moneys, etc.

It may here be observed that the facts pleaded in the foregoing petition are taken from the public records, and in themselves are not susceptible of much dispute, and that some of the allegations are in the nature of conclusions of law drawn from the facts alleged.

The answers of the several defendants and of the intervenor take up many pages of the record, and perforce our review of them is much condensed.

The answer of the city admits many of the allegations of fact and sets forth the city's version of the legal effect to be drawn therefrom, and so far as necessary, these allegations will be mentioned later. It is also alleged that plaintiff's petition does not state a cause of action for the following reasons:

The city is expressly authorized by statute to make the lease contract; the petition fails to allege that under the lease contract under consideration and including those leases assigned to The Minnesota Avenue, Inc., and those procured by it, and including further the rental contract of the cold-storage warehouse retained by the city, the rates of rental will not be sufficient to meet statutory requirements and at the same time comply with the decrees of the federal courts; the petition fails to allege any complaint of the city's action by the holder of any revenue bond; the petition fails to allege that the lien of bondholders on the revenues obtained has been impaired and on the contrary shows revenues for 1942 will be sufficient to meet statutory requirements; the petition fails to show facts from which it may be inferred the moneys collected by The Minnesota Avenue, Inc., are public moneys as defined by G. S. 1935, 9-301; the petition fails to state any allegation the city acted without constitutional or statutory authority or in excess of powers conferred or that there was any lack of corporate capacity; and also the petition fails to set out any charge of fraud, collusion or corruption, or that the city in good faith failed to exercise its best judgment in making the lease contract. The answer of The Minnesota Avenue, Inc., covers about the same grounds and alleges further that the question of the power of the city to lease the levee, the

liability of the city on the bonds, and the right of the city to pay the four accounts totaling $40,000.88 are *res judicata*, attention being directed to certain decisions of this court, and that if the statutes above mentioned are construed as contended for by plaintiff, the property of The Minnesota Avenue, Inc., will be taken from it without due process of law. The answer of the Union Pacific Railroad Company is to the same general effect as that of the city, and its prayer is that plaintiff be denied the relief sought and that judgment be entered against plaintiff for costs.

It is not necessary to set out in detail the plaintiff's reply. Generally, it may be said to contain a general denial and to expand some of the allegations of the petition and to answer allegation of conclusions of fact and of law in the various answers filed.

The motion raising questions of law proposes ten questions of law divisible into three general groups. The first group of three questions deals with whether the lease contract is valid and within the power of the city, whether the rents received under it by The Minnesota Avenue, Inc., are public moneys, or whether only the net amount received by the city constitutes public moneys, and whether the lease contract must, to be valid, provide for a fixed and definite rental. The second group of two questions concerns the payment of the four accounts totaling $40,000.88, and the third group of five questions deals with the sufficiency of the petition to state a cause of action. Each group will be considered insofar as is necessary.

We approach consideration of the several questions, bearing in mind there is no contention any statute involved is unconstitutional, or that the city lacks power to make a lease, and that there is no claim there was fraud or collusion or any abuse of discretion. The primary question is the validity of the lease. Plaintiff predicates many of its arguments on the proposition that all of the statutes heretofore reviewed pertain to the improvement and leasing of the public levee, are *in pari materia*, and that any valid lease must meet the various requirements of the several statutes. It is not necessary that we enter into any extended discussion of this phase of the matter, for the above review discloses that as compared to one another, some of the above acts are of general application while others are limited to cities of a certain size, and that they affect Kansas City particularly is not open to debate. If there are inconsistencies the latter acts must control.

One of the state's complaints is that under Laws 1929, chapter 125, section 3 (G. S. 1935, 13-1076), the lease is not valid because of its failure to include a reservation to the city of ·the right to establish harbor lines, etc., as in that section provided. Without regard to whether that is necessary or not, we think that if it is, the matter is covered by the lease contract, one provision of which is quoted above wherein the lessee agrees to conform in all respects with the laws of Kansas with respect to the leased premises, and the other provision referred to that in the use and occupancy of the premises the lessee shall conform to and comply with all laws applicable to the leased premises.

Although perhaps not urged as a matter of primary importance, the state suggests that all of the statutes taken together authorize only a lease of the levee as a whole to one who will agree under all conditions to pay a definite stipulated amount of rent sufficient to meet statutory requirements. Under that theory if the levee and its improvements, representing an actual cash outlay of over five million dollars, cannot be leased to one individual, then the city must operate it or it must lie idle. We think the statute does not require the entire levee be leased to one lessee, nor that the lease be for a full term of ninety-nine years. None of the statutes relied on contains any restrictions to that effect. Under Laws 1929, chapter 115, G. S. 1935, 12-672, pertaining to cities generally, the city may operate or lease, while under the act affecting Kansas City specially (Laws 1933 [Special Session], chapter 43, sections 5, 6; G. S. 1935, 13-1242, 13-1243), provision is made for the city to fix charges for the uses of and services to be rendered by facilities on the public levee and under each act the city is given the power to lease upon such conditions as in its judgment will be to its best interest. We are of opinion that the city had the power to lease all of the levee to one tenant or to lease different parts to different tenants, as was recognized in State, ex rel., v. Kansas City, 140 Kan. 471, 480, 37 P. 2d 18. The question of the amount of rent will be considered later.

There is also some contention, not supported by citation of authority, that the agreement does not constitute a lease for the reason the relation of landlord and tenant is not created—that the agreement rather is one whereby the city has delegated to The Minnesota Avenue, Inc., its right to manage and operate the levee and the facilities thereon. Much could be written dealing with the

relationship of landlord and tenant. While the mere use of those terms, landlord and tenant, or lessor and lessee, is not at all conclusive, some weight may be put on the fact that terms usual to a lease and to the relationship are used. In the instant case there can be no argument that possession was delivered for it is so alleged in the petition. Under the contract one facility is excepted, and leases on other facilities are assigned to the lessee who agrees to abide by them, but otherwise the so-called lessee is authorized and entitled to make such leases as it sees fit, at rentals in compliance with the statutes of Kansas and the pertinent orders of the federal court. Without restatement, it also has certain duties and obligations to perform under the contract, and not unlike those often found in commercial leases. It may be said in a general way that except for provisions inserted to comply with statutory requirements, the lessee is in absolute control of the property. Nor do we believe the fact the rentals to be received by the city were determinable on the total rents to be received by the lessee from sublessees takes away from the agreement its effect as a lease. Although payment of money rent is a usual condition of a lease, it is not an absolutely essential condition—leases of farm lands on a share basis and of gasoline filling stations on a percentage of sales basis are common. And see 32 Am. Jr. 348, 35 C. J. 951. Without specification thereof it is clear that the mutual promises in the contract constitute a sufficient consideration. And as bearing on whether a contract, whereby a party designated as lessee who agreed to pay as rent the profits of a business in excess of a fixed amount, constituted a lease, and in which the court held that it did, see *Ault Wooden-Ware Co. v. Baker*, 26 Ind. App. 374, 58 N. E. 265. We note also the state's contention that the provision the lessee shall not be liable for rent for office space, as provided in section 9 of the lease quoted above, is contrary to and inconsistent with the relationship of landlord and tenant. We think not. It is not uncommon in renting on shares to provide that no rent shall be due for pasture, garden plots, etc. Without further discussion we think it may not be said the agreement is not a lease.

The next contention is that the agreement is not valid as a lease under the statute for the reason no definite rental is fixed from which it may be determined the city will receive an amount sufficient to pay the maintenance charges and the interest and principal of the revenue bonds as required by statute. The particular premise

for this contention is the language of the proviso at the end of Laws 1933 (Special Session) chapter 43, section 6, G. S. 1935, 13-1243, and to an extent ignores the previous part of the above section that the lease shall be for such rental and upon such conditions as in the interest of the city will be for its best interest. Later herein mention is made the petition fails to charge that the rentals made under this particular lease contract, with the rentals from other facilities, will not be sufficient to pay statutory charges. Under the lease contract as executed, it is provided by section 8, quoted above, the rates of rental charged shall comply with the laws of the United States, the decrees of the federal courts and with the requirements of G. S. 1935, 13-1242 and 13-1243. That provision of the lease is in accord with the requirements of the statute, and bearing in mind the previous efforts of the city to rent the various units of the facility, the effect of the injunction issued by the United States district court, etc., and the duty of the city to rent the facility so as to produce revenue for statutory purposes, it appears to have been made in the exercise of the city's discretion, and there being no charge of fraud, collusion, or abuse of discretion, this court may not interfere merely because some other method might better have been devised and followed.

The state also contends that the entire amount of rentals received by The Minnesota Avenue, Inc., are public funds and must be paid into the public treasury and disbursed in compliance with applicable statutes. Laws 1933, chapter 161 (G. S. 1935, 9-301 et seq.), was an act to define public moneys, etc., and by section 1 it was provided that all moneys which shall come into the hands of any officer of any city pursuant to any law authorizing him to collect and receive the same shall be deemed public moneys. Although the city might itself have operated the facilities on the public levee by renting parts thereof to a series of tenants and have collected all rents arising therefrom, which undoubtedly would have constituted public moneys, it did, as it was authorized to do, enter into a single lease with a single tenant with the exceptions heretofore noted. Under that lease, and it was not void for any reason so far considered, the rental to be received by the city was not the amounts collected by its lessee, but only a stipulated part thereof, and that it received such part and properly accounted therefor is not disputed. The state's contention the total amount of rents received by The Minnesota Avenue, Inc., constituted public moneys is not good.

Although mentioned at the oral argument, not much space in its brief is devoted to the state's contention that by reason of the provisions for a committee to approve an operating budget as provided in section 9 of the lease contract, quoted above, the city unlawfully delegated its powers to the lessee, nor is there separately discussed the state's contentions the lease contract is invalid because under it public moneys are expended contrary to statute in that the city auditor does not examine and approve claims, and that the city purchasing agent does not advertise for bids for supplies in excess of $1,000, and that the city engineer does not approve plans and estimates on public improvements. With respect to these various contentions, we make the following observations: We have previously noted that the primary act under which the city acted to improve the public levee is Laws 1933 (Special Session), chapter 43 (G. S. 1935, 13-1238 to 13-1245, inc.). Under section 6 (13-1243) the city is empowered to enter into an agreement with any person or corporation to erect and construct facilities and lease the same. Substantially the same power was conferred by Laws 1929, chapter 125 (G. S. 1935, 13-1074 to 13-1077, inc.). Under either statute the city could have made a contract whereby the lessee—not the city—would have made the improvements, in which circumstance, dependent on the exact agreement, the city would not have been concerned with any expenditure of money, and had it approved the general scheme of improvement, it would not be concerned with any further plans or estimates of cost. The present agreement was made in view of the fact the public levee is largely improved but that alterations or additions may be needed by the lessee. The provision for the committee to approve any budget for maintenance and construction costs is a limitation on the power of the lessee and not of the city, and is not subject to interpretation as being a delegation of any power or duty imposed by statute on the city. Under this provision approval of claims is not the function of the committee—such approval is the function of the city and we may assume it will perform its duty.

The pleadings disclose that prior to 1942 the rentals arising from all the facilities on the public levee were not sufficient to pay maintenance charges, interest and principal on the revenue bonds, etc., and that there was some deficit. Such a situation was not provided for in any statute, but because it exists does not warrant any conclusion that during the first year of successful operation the rentals

must be sufficient to cover all arrearages as well as necessary current obligations. Although possibly a question of fact in some aspects, it is not made to appear by the petition the rentals arising from the particular lease contract, when considered with rentals from facilities not covered by that contract, will not be sufficient to pay the current statutory obligations and leave some balance to be applied to previous arrearages. The operation of the public levee by the city is in its proprietary capacity. Not only under general principles, but under express statutory authority the city may exercise its best judgment. We may not strike down the city's action because of any conceived lack of wisdom or good business. We may only act when illegality or invalidity appears, and that we think is not disclosed.

From the foregoing we conclude the lease contract in question is valid and that the city had power to execute it; that the provision for rentals is sufficiently definite and that of the total rents collected by the lessee, only the portion due to the city is public money and accountable as such.

In its petition the state alleges the city wrongfully paid four accounts totaling $40,000.88, but specifies no date of payment. In its answer the city admits the payments and alleges that one was in payment of a judgment, and the others for expenses connected with the original improvement of the levee, the last payment being in July, 1942. The state's reply contains a general denial. It is clear, however, that the items did not arise from any operation under the lease contract involved, do not affect validity of that contract, and need no further comment here.

The remaining questions of law submitted will not be separately discussed. They deal with sufficiency of the petition to state a cause of action. As we understand the matter, however, the purpose of the action is to determine validity of the lease, and if that is so determined, nothing remains for trial. Therefore, we need not repeat the allegations of fact to determine correctness of the defendants' contention the petition is insufficient.

The present judgment is that the lease contract is valid.

We are informed that negotiations for other important subleases are in abeyance pending final disposition of this case. The state is given ten days in which to show cause why the action should not be dismissed.

PARKER, J., not participating.