No. 36,188

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF ED-
WARDS, *Appellant,* v. J. S. SIMMONS and HAROLD R. FATZER,
*Appellees.*

(151 P. 2d 960)

Opinion filed September 30, 1944.

*A. L. Moffat,* of Kinsley, argued the cause, and *W. N. Beezley,* county attorney, was on the briefs for the appellant.

*William H. Burnett,* of Hutchinson, argued the cause, and *Stuart Simmons,* of Hutchinson, was on the briefs for appellee J. S. Simmons.

*Paul R. Wunsch,* of Kingman, argued the cause, and *Walter F. Jones, Charles E. Branine, C. E. Chalfant* and *J. R. Hunter,* all of Hutchinson, were on the briefs for appellee Harold R. Fatzer.

The opinion of the court was delivered by

HOCH, J.: This was an action by a board of county commissioners to recover from the defendants money retained as attorney's fees from collections made under a judgment for delinquent taxes. The trial court sustained defendants' motion for judgment on the pleadings and the board appeals. The primary questions are whether a contract made with one of the attorneys by a prior board was valid; whether, if valid during the term of the board making the contract, it was binding upon subsequent boards; and whether the plaintiff board by its acts had adopted or ratified the contract.

The Wichita & Northwestern Railway Company—hereinafter called the railroad—operated a railroad line in Pratt, Edwards, and Pawnee counties. The railroad began operations in 1916. It early ran into financial difficulties and in 1922 was placed in receivership in an action instituted in Reno county. On account of the service which the road rendered to the communities served, many public officials, civic bodies, and others made earnest efforts to prevent discontinuance of operation. The whole situation was the subject of

many public meetings and conferences. No taxes were paid during the receivership, and with great difficulty operations were kept going until the summer of 1940, when operation ceased. Under order of the court the assets of the railroad were sold on February 15, 1941.

The instant action was filed in the district court of Reno county on February 13, 1942, by the board of county commissioners of Edwards county, consisting of Fritz Schultz, Wm. G. Weyrich, and Charles Anderson. In its petition the plaintiff alleged that the defendants, J. S. Simmons, an attorney at Hutchinson, Kan., and Harold R. Fatzer, an attorney at Kinsley, Kan., while acting as its attorneys, filed in the Reno county district court a claim for railroad taxes due to Edwards county; that there was a contested question with reference to a certain mortgage on the railroad property; that in January, 1941, the district court of Reno county allowed the Edwards county tax claim in the amount of $63,539.12 and held that it was prior to the claim of the mortgagee; that subsequent thereto and in February, 1941, and while the time for appeal on the question of priority as between the mortgagee and the taxes had not yet expired, a compromise was effected with the judgment debtor for the sum of $56,596.68; that this amount was not paid into court or to the receiver, but was paid direct to the defendants; that the defendants "wrongfully, illegally, and arbitrarily retained from said amount the sum of $8,489.49, and paid or remitted only the balance of said settlement money to the plaintiff"; that the defendants did not make claim for fees or permit the plaintiff to consider and determine the question of attorney's fees, and that the amount retained by defendants was "grossly excessive and highly unreasonable." Upon motion of defendants the words "wrongfully, illegally and arbitrarily" were taken out of the petition and in this ruling the plaintiff acquiesced. In this connection it is only fair to say that no contention is here made that a contract was not entered into by a prior board with defendant Simmons nor that Simmons did not render legal services under the contract over the many years involved, nor is it contended that defendant Fatzer did not render legal services for the county outside of the county in assistance to Simmons.

The subsequent pleadings are lengthy and no helpful purpose would be served by here embodying them in full or even by sum-

marizing all their recitals and allegations. The answer of defendant Simmons covers eleven closely printed pages of the abstract, and the answer of defendant Fatzer covers about twenty-two pages. The replies admit many of the allegations or averments of the answers. With reference to most of the others plaintiff "neither admits nor denies" them. The averments of fact contained in the answers and which are not denied will be herein treated as admitted. (G. S. 1935 60-748.)

There is little disagreement as to the facts, and from the pleadings we will attempt to summarize only those which are material to the issues before us. In May, 1927, the board of Edwards county entered into a contract with Simmons to act for it in the collection of taxes assessed against the railroad in that county. This contract, which provided for an attorney's fee upon a contingent basis, was placed of record in the journal. Following this contract Simmons filed in the district court of Reno county various applications for orders directing the receiver to pay delinquent taxes and in September, 1931, the court ordered the receiver to pay to Edwards county the unpaid taxes for the years 1930 and 1931 and such other taxes as in the discretion of the receiver could be paid and still continue the operation of the railroad. The receiver did pay the 1930 and 1931 and the first half of the 1932 taxes. The taxes were paid to Simmons, who retained 15 per cent as provided in the contract and remitted the balance to the board, which accepted it and directed the county treasurer to distribute it to the various county subdivisions entitled thereto.

Simmons had a similar but not identical contract with the boards of Pratt and Pawnee counties. Acting for the board, as well as for the boards of Pratt and Pawnee counties, Simmons was instrumental in securing the passage by the Kansas legislature of a certain statute (G. S. 1935, 79-2101a, 79-2101b, 79-2101c) relating to the delinquent taxes owed by certain public utilities, and to which reference will later be made. The contracts with the three county boards not being identical, the three boards met with Simmons at Pratt, Kan., in November, 1931, for discussion of the whole matter, both as to procedure and compensation, with the result that a new and modified contract was entered into between each of the three boards and Simmons. The contract was as follows:

"November 21, 1931.

"Board of County Commissioners of Pratt, Pawnee and Edwards County.

"Referring to the result of our conference at Pratt, and following the arrangement made there, I am writing you this letter to be placed on file and approved by the different boards as a full statement of our contract in regard to our services in connection with the collection of the taxes of the Wichita & Northwestern Railroad now in receivership.

"I do not believe that this changes the present bargain in any way, but it does make it more definite and certain, and if it conflicts in any way, this letter is to control.

"FIRST: I understand that the boards intend to repeal the resolution in regard to employing the firm of Long, Houston, Stanley and Depew. While I sincerely regret this and do not think it best, I will of course have to accept it.

"SECOND: It is understood that we are to make no claim to commission for the collection of the taxes in the future as long as they are paid in the regular course of the payment of taxes and that if the counties desire our services in any way in connection with these future taxes, they are to request it and arrangements will be made at that time.

"THIRD: That we are to have a commission of 15% on all collections that are made in the future but 'It is understood that the boards of county commissioners of Pratt, Edwards and Pawnee Counties shall have the right to make a compromise of the indebtedness due from the Wichita & Northwestern Railroad Company other than in money, in which case the said Boards of County Commissioners shall pay J. S. Simmons of Hutchinson, Kansas, such fee if any, as they deem his services have actually been worth to said counties.

"I will be very glad if the Commissioners will place this letter on file and adopt a resolution approving it, or such other steps that appear proper to them.

Your truly,

(Signed): J. S. SIMMONS,

SIMMONS, FENN & WYMAN.

"Resolved that the above letter be placed on file and adopted as the same is of record.

Board of County Commissioners,

(Signed): J. W. PETERIE, *Chairman,*

GUY JENKINS,

H. L. BRIDGES."

The contract was duly spread of record and a resolution passed approving it.

In October, 1936, the board, together with the boards of Pratt and Pawnee counties, and the county attorneys of the three counties met with Simmons at Kinsley. That meeting resulted in the appointment of a committee, one member for each of the counties, to carry on negotiations with certain other railroads for the purpose of con-

tinuing the railroad's operation if possible. The county commissioners of the three counties were kept informed of the work of this committee..

In September, 1937, the appellees—with full knowledge of the board—filed an intervening petition in the district court of Reno county requesting an order directing the receiver to pay delinquent taxes. The application was denied owing to the lack of funds sufficient to continue operations and to pay the taxes. In 1938 the board purchased considerable county highway materials which were shipped over the railroad and defendant Fatzer held various conferences with the receiver for the purpose of having the freight paid by the county on such materials applied on the taxes due the county. In August, 1938, the district court of Reno county made an order directing the receiver to so apply such freight and the sum of $335.70 was so applied.

In July, 1939, the board—one of whom was Fritz Schultz, a member of the board involved in the instant action—passed a resolution directing that application be made for an order for further payment by the receiver on the delinquent taxes. Such application was filed by defendants and the board was informed as to the date of the hearing upon it and together with defendants Simmons and Fatzer attended a conference with reference to the matter.

In July, 1940, the receiver reported to the district court of Reno county that it was impossible to continue operation of the road. Order was subsequently entered authorizing suspension of operations and preparations were made for a sale of the railroad assets. The federal government at that time held a mortgage on the railroad to secure the payment of a loan of something over $381,000, upon which interest was in default for many years, and also held a receiver's certificate for something over $45,800 upon which interest was also long in default. Issue was raised as to whether the delinquent taxes or the government's mortgage and receiver's certificate were entitled to priority. The defendants advised the three boards as to this important issue of priority, and presented and argued it to the court. Subsequently the court allowed the claim of the federal government in the sum of $773,107.38 on the mortgage and in the sum of $45,-802.16 on the receiver's certificate, but held that the liens of the three counties were prior to the lien of the federal government.

On January 2, 1941, the receiver was ordered to sell the assets. Pending sale of the assets and before the time had expired in which

the federal government could appeal from the order fixing the priorities, the Machine Tool and Equipment Company purchased the lien of the federal government and a representative of that company called upon defendant Simmons and indicated that his company desired to purchase the claims of the plaintiff county and the other two counties. Whether his initial offer was $75,000 or $90,000 for the claims of all three counties is not clear from the pleadings.

The appellees called a meeting of the boards of the three counties at Kinsley for the purpose of considering whether the claims should be sold or whether the counties should await the decision on a possible appeal by the federal government on the question of priority. Following this meeting each of the three boards passed a resolution authorizing the defendants to make a sale, compromise or settlement of the claims and judgment if a satisfactory price could be obtained. Following the passage of this resolution all the members of the three boards met in the office of Simmons in Hutchinson and there determined that the liens of the three counties should be sold to the Machine Tool and Equipment Company for the sum of $125,000 and that Simmons should collect and distribute the same to the different counties. The above figure was arrived at after various negotiations between defendants and the purchaser. The total claim of the three counties was $140,333.16. The sale was effected by defendants and on February 14, 1941, the purchaser paid $10,000 to Simmons upon the purchase price and on the following day paid to Simmons the remaining sum of $115,000, such payments being with the knowledge and approval of the board and also of the boards of Pratt and Pawnee counties. The said $125,000 was paid direct to Simmons, who deposited it in the account of the partnership law firm of which he was a member, and thereafter Simmons remitted the balance of $106,250 to the three counties after deducting the 15 per cent agreed upon as a contingent fee. Simmons employed an auditing firm to determine the amount due to each of the three counties on a pro rata basis and as a result of this calculation $48,187.14 was remitted to the plaintiff board.

Together with the remittance Simmons transmitted a copy of the auditor's report which showed the amount of the county's judgment and the amount deducted by Simmons for compensation for his services. This was done in connection with a letter addressed by Simmons to Fatzer, which is as follows:

"Simmons, Fenn & Hurtt
Attorneys and Counselors at Law
405 American National Building
Hutchinson, Kansas

February 15, 1941

"Mr. Harold R. Fatzer
County Attorney
Kinsley, Kansas

Re: Wichita Northwestern Railway Co.

"Dear Mr. Fatzer:

"Mr. Geiger got around with his draft today, and I am glad to be able to close up this matter. I am enclosing you the auditor's figures showing that Edwards County's part of the $125,000.00 is $56,596.66, and I have deducted the fifteen per cent according to our contract, and enclose you herewith check for $48,107.16. As I have said to you and Mr. Strobel at different times, I felt from the beginning that since this business was largely outside of the counties, you would have a right to make a charge against the counties for your services in the matter, and that under my contract I should take care of this, and the first time you are down here I will go over the matter with you and be ready to give you a check for whatever we agree on, and I know we will have no trouble reaching the amount. There were nine bids opened this morning running from $65,000 to $167,000. The last bid, of course, was the bid of the Machine Tool & Equipment Corporation, to whom the counties sold their claim, and as he had bought the government's claim so cheap, this wouldn't in any way indicate values. Of the other eight bids four of them were below $100,000. One, as I recall it, was for $105,000, and this means they were all below what we got for our claim. There was one bid for $137,000, and considering that out of this sale money the costs would have to have been paid, it would cut it down to just about what we got. There was one other bid for $152,000 that was made by the parties that dickered with us, and as I understand it, they made it pretty high in hopes they might catch Mr. Geiger napping. It all means that at the very least we got our compromise pretty close to the amount we would have gotten if we had not compromised and had won the appeal, and of course, we would have gotten nothing if we had lost it, so that I consider that we did a mighty good job in the matter. Our fee might look like it was pretty large, but as you know, I took this on a contingent fee and have given it attention for the last thirteen years, making numerous trips to the different counties and matters of that kind, and have had considerable expense besides that, and at times it looked to me very much like I would get no pay at all. I want to add another thing, and that is that in the thirteen years that we have been working at this I have admired the attitude that the Board of County Commissioners took, and I am very sure that this present Board took particular pains to give the matter consideration and to do the very best they could for the counties. We were all sorry the road could not be made to run, but that was just an absolute impossibility. Come down and see me soon.

Your truly,

J. S. Simmons/s
J. S. Simmons."

JSS:HM

The check for $48,187.14 was made payable to the board and on February 21, 1941, was endorsed by that board as follows:

"Pay to George Tieperman, County Treasurer of Edwards County, Kansas, the Board of County Commissioners of Edwards County, Kansas, by its members, Fritz Schultz, Chairman, Charles Anderson and William G. Weyrich, Members of said Board.

FRITZ SCHULTZ, Chairman
CHAS. ANDERSON, Member
WM. G. WEYRICH, Member."

On the same day the board adopted a formal resolution accepting the money "received in the settlement compromise of the tax claim and judgment" and directing the treasurer to distribute the same to the respective subdivisions of the county.

During all or most of the time in which this matter was handled by Simmons he had associated with him attorneys Alva L. Fenn and Stewart Simmons. Out of the money retained from collection on the judgment Simmons paid Fenn for his services the sum of $2,725, and to Stewart Simmons $2,500. To defendant Fatzer, Simmons paid out of the money retained by him the sum of $2,829.83. What amounts, if any, were paid by Simmons to county attorneys or other attorneys of the other two counties is not shown by the record and is of no concern here.

Fatzer made no claim against Edwards county and no money was paid to him by the county. Nor is it contended that Edwards county paid any money to Simmons during the many years the matter was being handled by him, either for services or expenses, and the only money received by Simmons was the amount which he retained as hereinbefore related.

Various orders not necessary to relate were procured from the court by the appellees in connection with the closing of the transaction.

In its reply the board alleged that "the first time that two of the present commissioners ever heard of a possible 15 percent services claim on the part of the defendant Simmons or anyone else" was when they received the check above referred to; that it then objected to the deduction of the fifteen percent attorney's fee "and were then told of the old contract by the county attorney, Mr. Fatzer, who advised them that there was nothing that could be done about it and that the deduction must be acquiesced in"; that it accepted and endorsed the check upon the advice of the county at-

torney and without knowledge that he had "a personal financial interest in the retained percentage"; and that the arrangements between Simmons and Fatzer "were concealed from this plaintiff and its officers and were unknown to the plaintiff." The matter of this alleged lack of knowledge and alleged concealment on the part of Fatzer as to his arrangement and understanding with Simmons will be referred to later.

The first and primary question is whether the contract entered into on November 21, 1931, and under which Simmons performed services during the years that followed and up to the final settlement was valid. We need not concern ourselves with the prior contract made in 1927 and under which he had already performed services.

In support of its contention that the contract was void appellant relies principally upon two lines of decisions of this court. The first line deals with the so-called "tax ferret" contracts—contracts with individuals for the purpose of discovering and listing property not returned for taxation by its owners. (*State, ex rel., v. Sedgwick County Comm'rs,* 150 Kan. 143, 91 P. 2d 2, and cases cited.) The second line deals with attempts to employ methods not prescribed by the statutes in collection of delinquent taxes. (*Sherman County Comm'rs v. Alden,* 158 Kan. 487, 492, 148 P. 2d 509, and cases there cited.) In both classes of cases we have held that the subject of assessment and collection of taxes being covered by statute, official powers are limited to those expressed or clearly implied in the statutes. We adhere to that doctrine and would in no way weaken it. Appellees contend that independent of the specific statute involved— heretofore referred to—the board had statutory power to enter into the contract with Simmons. We do not find it necessary to consider that contention.

It is agreed that the primary purpose of the specific statute was to meet such situations as then existed with reference to this railroad. The statute was enacted in March, 1931. Subsequent thereto, and on November 21, 1931, the instant contract was entered into. The statute is as follows:

"79-2101a. In case the taxes assessed against any public utility corporation are not paid on presentation of the tax warrant issued as provided in section 1 (79-2101) chapter 286, Laws of Kansas for 1929 (being section 79-2101, Revised Statutes, Supp. 1930), and it is impractical to levy such warrant on the property of said corporation sufficient to pay said taxes, the board of county commissioners may direct that a suit be brought against said corporation or individual for said taxes, and that a receiver may, in the discretion of the court

in which said action is brought, be appointed for said corporation, and such proceedings taken therein as are necessary to collect said taxes, or may intervene in any suit brought, or that shall hereafter be brought, by any other parties.

"79-2101b. If the receiver of any corporation appointed in any suit, under this act or otherwise, is not able to collect said debts by the sale of said property, or a part thereof, then the county commissioners of said county may compromise said taxes with said receiver, or with said corporation or any reorganization committee or other party, if they deem it to the best interests of the municipal corporations interested in said tax, and may take in payment of the same, cash, bonds, stock or other security of said corporations purchasing said property, and may make it a condition of such compromise that the owners or purchaser of said property shall give service on certain terms to any municipality interested therein. Any municipal corporation to which a part of any of such taxes are due is authorized to accept payment of all or any part of such taxes in such stocks or bonds: *Provided,* That no such compromise shall be made unless approved by the court in which said receivership is pending, and the court shall direct a reasonable notice to be given of the pendency of said application to compromise, and any such municipal corporation, or any taxpayer or association in any way interested in said taxes shall have a right to be heard on said application.

"79-2101c. This act shall apply only to public utility corporations operating in not more than four counties."

Appellant's first contention as to the statute is that it is unconstitutional. The contention is based upon the fact that the act applies only to public utility corporations "operating in not more than four counties." (79-2101c.) To uphold this contention we would have to say that the classification made by the legislature is arbitrary, fictitious, and wholly without substantial basis. We cannot say that. The statute is not unconstitutional for any reason here presented.

The plaintiff next contends that the statute is not applicable because common carriers are not "public utility corporations" under Kansas law. Attention is called by appellant to the definitions of "public utilities" and "common carriers" as found in our regulatory statutes. Section 66-104, G. S. 1935, provides that the term " 'public utility' *as used in this act*" shall refer to telephone and telegraph services, to the transportation of oil and gas through pipe lines, to the operation of street railways, and "all companies for the production, transmission, delivery or furnishing of heat, light, water, or power," etc., and section 66-105 provides that the term " 'common carrier' *as used in this act*" shall include railroads, express companies, etc., operating for public use in the conveyance of persons or

property. Therefore, argues appellant, a railroad is not a "public utility corporation" within the meaning of the instant statute, even though the act was passed for the very purpose—admitted so by appellant—of reaching the case of this railroad. The contention is not good. The definitions contained in the regulatory statutes were specifically limited to those statutes. They were obviously incorporated for convenience and clarity in connection with regulations separately applicable to common carriers and to other public utilities. In the absence of expressed intention otherwise it must be assumed that the legislature here used the term "public utility corporation" in its broad and general meaning. Unquestionably that general meaning includes common carriers. The essential characteristic is that the utility be one which is dedicated to public use, without unreasonable discrimination. From 51 C. J. 4 we quote:

"A 'public utility' has been described as a business organization which regularly supplies the public with some commodity or service, as electricity, gas, water, *transportation,* or telephone or telegraph service. . . . the distinguishing characteristic of a public utility is the devotion of private property by the owner or person in control thereof to such a use that the public generally, or that part of the public which has been served and has accepted the service, has a right to demand that the use or service, so long as it is continued, shall be conducted with reasonable efficiency and under proper charges." (Italics supplied.)

For similar definitions see 43 Am. Jur. 571, and 35 Words and Phrases (Perm. ed.) 418. In *Southern Pac. Co: v. Railroad Com.,* 13 Cal. 2d 89, 102, 87 P. 2d 1055, at page 1061, it was said: "As hereinbefore has been indicated, common carriers are considered as being among public utilities." In *Seaboard Air Line Ry. v. McRainey et al.,* 69 Fla. 462, 466, 68 So. 753, 754, it was said "Common carrier railroads are public utilities," etc. Countless other cases might be cited.

Appellant next contends that even if the special statute is valid and applicable it provides no authority to support the contract. The statute provides that a board of county commissioners may direct that suit be brought against the delinquent utility corporation, that a receiver may be appointed, that such proceedings may be taken as are necessary to collect the delinquent taxes, and that the board may intervene in any suit brought by other parties (79-2101a). It would be a wholly unreasonable construction to hold that the board might do all of that but might not employ attorneys for the purpose. The statute plainly contemplates that the board may employ such rea-

sonable means as are necessary to effect the statutory purpose. How else would the board have intervened in the receivership action in Reno county except by the employment of attorneys? County attorneys are under no obligation by virtue of their office to represent their counties in proceedings outside of the county.

The general rule is that when powers are expressly conferred the power is implied to take such reasonable means as may be necessary for the effective exercise of the powers conferred and the discharge of the duties imposed. (*State, ex rel., v. Younkin,* 108 Kan. 634, 196 Pac. 620, 46 C. J. 1032.)

Appellant next contends that even though the contract was valid when made by a prior board it could not be binding upon subsequent boards. It is not necessary here to discuss at length the broad question of the power of one board or other official agency to make a contract extending beyond its own term of office. Among our own cases appellant cites *Sheldon v. Commissioners of Butler County,* 48 Kan. 356, 29 Pac. 759, and *State, ex rel., v. Wyandotte County Comm'rs,* 131 Kan. 747, 293 Pac. 478. In the former case it was held that the board had no power to designate an official newspaper for a longer period than one year. In the latter case it was held that under the specific statute involved the board could not bind successor boards under a contract to pay a specified annual rent for a period of fifteen years for an armory to be built and used by the National Guard. Among cases cited by appellees are *Fisk v. Board of Managers,* 134 Kan. 394, 5 P. 2d 799, and *Verdigris River Drainage Dist. v. State Highway Comm.,* 155 Kan. 323, 125 P. 2d 387. In the former case it was contended that a five-year lease of land and improvements belonging to the Kansas Soldiers Home was invalid because it extended beyond the term of the members comprising the board. In upholding the contract this court said:

"The defendants call our attention to and cite as authority, *National Bank v. Peck,* 43 Kan. 643, 23 Pac. 1077; *Sheldon v. Comm'rs of Butler Co.,* 48 Kan. 356, 29 Pac. 759; *Comm'rs of Coffey Co. v. Smith,* 50 Kan. 350, 32 Pac. 30; *State, ex rel., v. Wyandotte County Comm'rs,* 131 Kan. 747, 293 Pac. 525, holding that a board of county commissioners cannot enter into a contract which binds its successor. An examination of these cases discloses that in each instance, the court was dealing with a particular statute, administrative in character, and that no necessity existed for a contract longer than the life of the board, and that in each instance the board was attempting to tie the hands of their successors. . . . Where general power is given to an administrative board to manage and control property it has the power to make a contract concerning such property extending beyond the term of the members thereof, if such con-

tract is reasonable and not contrary to public policy. This rule of law is recognized in all transactions with the board of managers involving a contract extending beyond the term of the members of the board, and its validity must of necessity depend upon the nature of the contract and the end to be accomplished. If the contract is reasonable, prudent and economically sound it is not contrary to public policy." (pp. 398, 399.)

In the Verdigris Drainage District case the county had entered into a contract with a local drainage district for permanent maintenance by the county of a drain and floodgate in a district levee. Validity of the contract was attacked on the ground that it attempted to bind the successors of the officers who entered into it. In upholding the contract this court said that counties are given broad powers relative to road construction and that unless such powers include the power to make such a contract as the one involved "no comprehensive program of road building could ever be carried out."

Decisions in other jurisdictions may show some conflict of authority, but each case must be viewed in the light of the specific provisions of the statutes there involved. And the test generally applied is whether the contract at issue, extending beyond the term, is an attempt to bind successors in matters incident to their own administration and responsibilities or whether it is a commitment of a sort reasonably necessary to protection of the public property, interests or affairs being administered. In the former case the contract is generally held to be invalid, and in the latter case valid. (14 Am. Jur. 210; 7 R. C. L. 945, 946; 46 C. J. 1032, § 289.)

We think the instant case falls clearly within the latter class. The board was acting under a statute authorizing intervention in receivership proceedings. Certainly it cannot reasonably be said that attorneys employed for such purpose lose all authority to act the moment the term of the contracting board expires, regardless of the status of matters pending in the receivership action. The most that could possibly be said to the contrary is that the incoming board would have power to terminate the contract.

In *Smith v. Cunningham*, 59 Kan. 552, 53 Pac. 760, it was said:

"In regard to the relation of attorney and client it may be said that the attorney's authority to act for his client continues until the end of the litigation, or until the discharge of the particular purpose for which he was employed, unless his authority is sooner revoked." (p. 554.)

If there were any doubt about the binding character of the contract it would be resolved by the fact that the appellant board not

only did not terminate it but by its acts ratified it. The contract was of record. The board had actual knowledge concerning it. In the light of the contract and of the letter, *supra,* from Simmons enclosing the check, it accepted the money and by formal resolution provided for its distribution by the county treasurer. It did this knowing that the attorney's fee had been deducted as provided in the contract. It was almost a year later when this action was instituted. Furthermore, the rule is that where an agent makes a contract for his principal the principal cannot take the benefits and not assume the burdens; he must repudiate the whole transaction or accept it as a whole. (*Watson v. Woodruff,* 154 Kan. 61, 72, 114 P. 2d 864 and cases cited.)

Appellant next argues that the money received by Simmons in compromise settlement of the judgment was public funds, that an attorney's lien does not extend to public funds, and that he should have remitted the whole amount to the county and then submitted a claim covering his services.

By formal resolution the appellees had been authorized by the board to compromise and settle the judgment. In *State, ex rel., v. City of Pratt,* 148 Kan. 885, 85 P. 2d 10, relating to compromise of claims against municipal corporations, cases from other jurisdictions dealing with compromise after judgment were cited and it was said:

"It thus appears that the cases generally relied on as supporting the right of a municipality to compromise a final judgment are quite limited in their effect, and if the question before us was the right of a county to compromise a judgment for unpaid taxes they would be persuasive." (p. 890.)

In the instant case the statute gives power to compromise the taxes and it would be a narrow construction to hold that the county could not compromise a judgment rendered for the delinquent taxes. In any event no complaint is made that the compromise was not regularly or lawfully made.

It may perhaps be debatable whether, under the statutory definition (G. S. 1935, 9-301) any part of the money paid to Simmons was technically "public moneys" prior to its reaching the hands of a regular officer of the county. (See *State, ex rel., v. McCombs,* 156 Kan. 391 at 403, 133 P. 2d 582.) But we need not determine that question. We find nothing in the attorney's lien statute (G. S. 1935, 7-108) which would prevent a lien from attaching under the facts here existing. The money paid to Simmons was money which—in the language of the statute—had "come into his possession in the course of his professional employment" and was "in his hands be-

longing to his client." We think he was entitled to a lien, under that part of the statute relating to "retaining" liens. (*Holmes v. Waymire,* 73 Kan. 104, 105, 84 Pac. 558; *State, ex rel., v. Glenn,* 144 Kan. 461, 61 P. 2d 1354; 6 C. J. 772; 7 C. J. 1065; 2 R. C. L. 1063, 1069.)

*Ahalt v. Gatewood,* 109 Kan. 328, 198 Pac. 970, is cited by appellant, in which an attorney's right to a lien was denied. But lien was denied under that part of the statute relating to a "charging lien"—that is, a lien "upon money due his client and in the hands of the adverse party"—because proper notice was not given. The decision was specifically limited to a "charging lien" and the opinion contained a quotation (p. 331) from 6 C. J. 772 to the effect that "a retaining lien is complete and effective without notice to anyone." Appellant also cites a number of our cases wherein compensation has been denied under contracts held to be illegal or void. The contract here being valid, the cases are not in point.

Appellant argues that decisions in which we have held that mechanics' liens could be enforced against schoolhouses, fire stations, or other public property (*Wilson v. School District,* 17 Kan. 104; *Comm'rs of Jewell Co. v. Manufacturing Co.,* 52 Kan. 253, 34 Pac. 741; *Huttig Millwork Co. v. Randel,* 125 Kan. 744, 266 Pac. 106, and others) are not persuasive on the present question of an attorney's lien. But appellant does not point out wherein the cases are not at least analogous. Both mechanics' and attorneys' liens are statutory, broad in their terms, and in neither case is public property or money expressly excluded from operation of the statute.

We need not extend the discussion on this point. The amount of the fee was already determined, being fixed by the contract. There is no contention that it was improperly computed. Under the situation here shown Simmons was entitled to deduct and retain the fee before remitting to the county. (*State, ex rel., v. Glenn,* supra.)

One other matter calls for some attention. Appellee Fatzer was county attorney of Edwards county from January, 1935, to March, 1941. During that period, and with the knowledge and consent of the board, he assisted Simmons and performed many and various legal services outside Edwards county in connection with Simmons' services under the contract, including the filing of the intervening petition, the attendance at many conferences, active participation in extended negotiations, etc. Appellant does not deny that these services were rendered. It asserts only that at the time the check from

Simmons was received by Fatzer it did not know of the arrangement between Simmons and Fatzer under which Simmons was to pay Fatzer out of the fee which he received under the contract, and complains that such arrangement was concealed from it and that it did not know that Fatzer had a financial interest when he advised them that the contract with Simmons was binding and that the remittance from him should be accepted. On the other hand, Fatzer alleged in his answer that the board accepted the money with full knowledge of all the facts. This presents an issue of fact not before us for review upon appeal from judgment on the pleadings. But it is clear that the board knew of the contract and in that knowledge accepted the money. And, in any event, Simmons retained no more than he would have been entitled to retain even if he had not chosen to pay part of his own fee to Fatzer and other attorneys for the services which they performed. And what is of equal importance is that Fatzer made no claim against Edwards county and the county paid him nothing.

There is no law in Kansas prohibiting county attorneys from engaging in private practice not inconsistent with their official duties. Nor do they have obligation to render professional services to the county outside the county. For such outside services contracts of employment may be made and additional compensation paid. (27 C. J. S. 424c. *Comm'rs of Leavenworth v. Brewer* [1872], 9 Kan. 307; *Huffman v. Comm'rs of Greenwood Co.* [1880], 23 Kan. 281; *Heinz v. Shawnee County Comm'rs* [1932], 136 Kan. 104, 12 P. 2d 816.)

Lastly, appellant contends that the "manner in which the fee was measured and exacted" was contrary to the budget law (G. S. 1935, 79-2925 to 79-2937) and the cash-basis law (G. S. 1935, 10-1101 to 10-1122). The contract was entered into and services performed under it before either of those laws was enacted. However, if the contract be considered a new one by virtue of a ratification by appellant the question would then be whether appellant's acts, amounting to ratification of the contract, constituted violation of those laws. We have no hesitancy in saying they did not.

The budget law provides for preparation, submission to public hearing, and adoption of a budget showing prospective revenues and expenditures for the ensuing year; prohibits, in general, tax levies beyond that required to raise funds sufficient to meet the budgeted items of expenditure, and makes unlawful the creation of indebted-

ness in excess of the budget. The cash-basis law forbids the creation of any indebtedness in excess of the funds actually available for meeting it.

The instant contract provided for a contingent fee chargeable only against certain collections of delinquent taxes, if and when made. The amount of the possible fee could not be determined in advance and in no event could it involve a charge against other revenues. The contract created no indebtedness. Indebtedness would arise and liability attach only when, and if, particular revenues became available from which to meet it. No provisions of either the budget or cash-basis laws have been pointed out which invalidate the contract.

Some other minor questions largely incidental to the controlling issues have been raised by both appellant and appellees. They have been fully considered but present nothing which would modify the result. Their discussion would needlessly extend this opinion.

We find no error. The judgment is affirmed.