John W. **CROMEANS.**, Jr.,
et al., Plaintiffs,

v.

**MORGAN KEEGAN & CO., INC.,**
et al., Defendants/Third–
Party Plaintiff,

v.

**The City of Moberly, Missouri, and The Industrial Development Authority of the City of Moberly, et al., Third–Party Defendants.**

No. 2:12–CV–04269–NKL.

United States District Court,
W.D. Missouri,
Central Division.

Signed Feb. 24, 2014.

Andrew P. Campbell, Caroline Smith Gidiere, Stephen D. Wadsworth, Leitman, Siegal, Payne & Campbell PC, J. Timothy Francis, James L. North & Associates, Birmingham, AL, Richard E. McLeod, The McLeod Law Firm PC, Kansas City, MO, for Plaintiffs.

Bernard Suter, San Francisco, CA, Charles W. Hatfield, Jeremy A. Root, Jefferson City, MO, John Norman Bolus, Birmingham, AL, Dale C. Doerhoff, Heidi Doerhoff Vollet, Timothy W. Van Ronzelen, Cook, Vetter, Doerhoff & Landwehr, P.C., Jefferson City, MO, for Defendants.

Bruce Cole, Capistrano Beach, CA, pro se.

## ORDER

NANETTE K. LAUGHREY, District Judge.

Third–Party Defendants the City of Moberly, Missouri and the Industrial Development Authority of the City of Moberly move to dismiss the Third–Party Complaint of Morgan Keegan & Co., Inc. for failure to state a claim. [Doc. # 197]. For the reasons set forth below, Defendants' motion is GRANTED.

## I. Background

On July 15, 2010, the City of Moberly, Missouri ("the City") approved issuance of $39 million in municipal bonds by the Industrial Development Authority of the City of Moberly ("the IDA"). The bonds were issued by the IDA to finance a project that included acquiring and improving an ap-

proximately 33 acre parcel of land as well as constructing and equipping a sucralose manufacturing and processing facility, all located within the City. During the process leading up to the sale of the bonds, the City selected Morgan Keegan & Company, Inc. ("Morgan Keegan") to serve as the underwriter for the bonds. Approximately 140 persons or entities purchased the bonds. Mamtek failed, however, and the bonds are now worthless.

Subsequently, this putative class action was filed on behalf of the bond purchasers against Morgan Keegan, among others. The claims of the putative class are based, in substantial part, on alleged material misrepresentations and omissions contained in the Official Offering Statement published in connection with the sale of the bonds. The putative class alleges that Morgan Keegan, as underwriter, prepared and distributed the Offering Statement and had a duty to conduct a due diligence investigation as to the accuracy of its contents.

After obtaining leave from the Court, Morgan Keegan filed a Third–Party Complaint against the City and the IDA. Morgan Keegan alleges that the representations in the Offering Statement are actually the representations of the City and the IDA and that these entities also undertook investigations in connection with the bond offering on which Morgan Keegan reasonably relied. Consequently, Morgan Keegan claims that, to the extent it may be liable to any bond purchaser based on the Offering Statement, the City and the IDA are jointly and severally liable and Morgan Keegan is entitled to indemnity or contribution from the City and the IDA.

## II. Discussion

Defendants argue that Morgan Keegan's Third–Party Complaint must be dismissed because Morgan Keegan's claims against them are barred by sovereign immunity. Unless expressly waived by statute, Missouri municipalities are entitled to sovereign immunity for governmental, but not proprietary, functions. *Junior Coll. Dist. of St. Louis v. City of St. Louis*, 149 S.W.3d 442, 447 (Mo.2004). Accordingly, to state a claim against a municipality, the plaintiff "must plead facts, which if taken as true, establish an exception to the rule of sovereign immunity." *Richardson v. City of St. Louis*, 293 S.W.3d 133, 137 (Mo.Ct.App.2009). In this case, Morgan Keegan argues that sovereign immunity does not apply, either because it has been waived by statute or because Defendants engaged in for-profit, and therefore proprietary, functions in connection with the bond issue.

### A. There Is No Express Waiver of Sovereign Immunity

For a statute to waive sovereign immunity, "the intent of the legislature to waive sovereign immunity must be express rather than implied." *Bachtel v. Miller Cnty. Nursing Home Dist.*, 110 S.W.3d 799, 804 (Mo.2003). Waiver cannot be established by inference or implication, *Zweig v. Metro. St. Louis Sewer Dist.*, 412 S.W.3d 223, 247 (Mo.2013), and statutory provisions regarding waiver "must be strictly construed" in favor of the existence of immunity, *Ford Motor Co. v. Dir. of Revenue*, 97 S.W.3d 458, 461 (Mo.2003).

Morgan Keegan argues that the Missouri Securities Act of 2003, commonly referred to as the Blue Sky Law, expressly waived sovereign immunity with respect to the claims Morgan Keegan asserts against Defendants. This act's section on definitions provides that "unless the context otherwise requires: ... 'Person' means an individual; corporation; business trust; estate; trust; partnership; limited liability company; association; joint venture; gov-

ernment subdivision, agency, or instrumentality; public corporation; or any other legal or commercial entity." Mo.Rev. Stat. § 409.1–102. The Blue Sky Law also makes it "unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: ... [t]o make an untrue statement of a material fact or to omit to state a material fact." § 409.5–501. In addition, this law provides that "[a] person is liable to the purchaser if the person sells a security ... by means of" an untrue statement or omission of a material fact. § 409.5–509(b).

The question presented by these statutory provisions is whether the Blue Sky Law's definition of "person" and provision that "a person" may be liable for making a misrepresentation or omission in connection with the sale of securities expressly evinces the Missouri legislature's intent to waive sovereign immunity in this context. Morgan Keegan, relying principally on the Missouri Supreme Court's decision in *Bachtel*, argues that it does. In light of the qualifying language used in the Blue Sky Law's section on definitions, however, *Bachtel* does not support a finding that sovereign immunity has been waived.

*Bachtel* involved a claim arising under the Omnibus Nursing Home Act, Mo.Rev. Stat. §§ 198.003, et seq., against a nursing home that was owned and operated by the Miller County Nursing Home District ("the District"), "a body corporate and political subdivision of the State of Missouri." *Id.* at 803. In *Bachtel*, the Court rejected the District's assertion of sovereign immunity because the provision of the Omnibus Nursing Home Act that created a private right of action for the claims at issue expressly applied to nursing home districts. *Id.* at 803–04. The creation of this cause of action coupled with the express inclusion of nursing home districts in the category of entities against which such an action could be brought

provided "the express showing of legislative intent required to find a waiver of sovereign immunity." *Id.* at 805. The Court further reasoned that a contrary rule, which would permit suits against private nursing homes but not nursing home districts, "would render meaningless the provisions ... allowing suits by residents of homes operated by nursing home districts." *Id.*

The Court in *Bachtel* also cited with approval two Missouri Court of Appeals decisions, which "recognized that in making the Missouri Human Rights Act (MHRA) applicable to state employers, the legislature [ ] expressly waived sovereign immunity even though the statute did not contain a provision specifically stating the defense of sovereign immunity is waived." *Bachtel,* 110 S.W.3d at 804 (discussing *H.S. v. Bd. of Regents, Se. Mo. State Univ.,* 967 S.W.2d 665 (Mo.Ct.App.1998), and *Keeney v. Mo. Highway & Transp. Comm'n,* 70 S.W.3d 597 (Mo.Ct.App.2002)). In *H.S.,* the court reasoned:

> The definition of 'employer' in Section 213.010(6) RSMo includes 'the state, or any political or civil subdivision thereof.' Section 213.055 RSMo provides that it shall be an unlawful employment practice: '(1) for an employer, because of race, color, religion, national origin, sex, ancestry, age or handicap of an individual ...' to discriminate. Clearly Section 213.055 RSMo was meant to apply to the state and its political subdivisions. Section 213.101 RSMo further provides that 'the provisions of this chapter shall be construed to accomplish the purposes thereof and any law inconsistent with any provision of this chapter shall not apply.'

*H.S.,* 967 S.W.2d at 673. In discussing these decisions, the *Bachtel* Court remarked that the absence of specific language waiving sovereign immunity was not

dispositive, because "[t]he required specificity was contained in the express statement in [the] MHRA that the act applied to the State." *Bachtel,* 110 S.W.3d at 804.

█ In this case, however, it is not so evident from the plain language of the statute whether the legislature intended the cause of action created by the Blue Sky Law to apply to state entities. Morgan Keegan relies solely on this statute's provision for a private right of action against "a person" and the general definition of "person" as used in this act. Yet, Morgan Keegan fails to address the qualifying language included in the section on definitions, which provides that these definitions apply "unless the context otherwise requires," Mo.Rev.Stat. § 409.1–102. As the Blue Sky Law never expressly mentions sovereign immunity, it is plausible that, in the context of a provision establishing civil liability, the context requires excluding public entities from the definition of "person" due to the existence of sovereign immunity.

As a result, the Blue Sky Law is susceptible to two plausible, yet conflicting interpretations with respect to whether the legislature intended to waive sovereign immunity, and this ambiguity precludes a finding that this act evinces the legislature's express intent to waive sovereign immunity. In *Bachtel* and the cases discussed therein, there was no such ambiguity, as the statutes at issue did not contain any qualifying language of the sort the legislature included in the Blue Sky Law. *See Bachtel,* 110 S.W.3d at 803; *H.S.,* 967 S.W.2d at 673. As the intent "to waive sovereign immunity must be express rather than implied," *Bachtel,* 110 S.W.3d at 804, and statutory provisions waiving immunity are to be "strictly construed," *Ins. Co. of Pa. v. Dir. of Revenue & Dir. of Ins.,* 269 S.W.3d 32, 36 (Mo.2008), the ambiguity in the text of the Blue Sky Law

counsels strongly in favor of finding that immunity has not been waived.

█ Furthermore, Morgan Keegan has not presented any argument or authority that supports its interpretation of the ambiguous text of the Blue Sky Law. By contrast, in *Bachtel* the legislature's intent could further be discerned from the fact that, if sovereign immunity applied, portions of the relevant statutes would have been rendered meaningless, and "[t]he legislature is presumed not to have enacted a meaningless provision." *Bachtel,* 110 S.W.3d at 804.

In this case, there is no indication that the existence of sovereign immunity would render any provision in the Blue Sky Law meaningless. If the term "person" was only used in the statute's section on civil liability, then a finding that sovereign immunity precluded liability would render meaningless the inclusion of governmental entities in the statutory definition of person. However, "person" is used frequently throughout Article 3 of the Blue Sky Law, which governs the registration of securities and the Commissioner of Securities' authority to deny, suspend, or revoke this registration. *See, e.g.,* §§ 409.3–305, 409.3–306. As sovereign immunity would not exempt municipalities from fulfilling these requirements or abiding by the decisions of the Commissioner, a finding that the Blue Sky Law does not waive sovereign immunity would not render the act's definition of "person" meaningless. In addition, the Blue Sky Law defines an "Issuer" as "a person that issues or proposes a security." § 409.1–102(17). Thus, including municipalities in the definition of "person" is necessary for the act to account for the issuance of securities by municipalities. This need exists even if "person" is interpreted not to include municipalities in the section on civil liability, due to the act's repeated use of the

term "issuer" in unrelated sections. *See, e.g.,* § 409.3–303(b)(3).

Finally, in the most analogous case cited by either party, the Ninth Circuit reasoned that the state securities law at issue was of a type that "promotes much more general policies throughout the public and private sectors and advances no specifically *governmental* interest that would support a finding of intent to abrogate any [public entity] immunity." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.,* 730 F.3d 1111, 1126–27 (9th Cir.2013) (quotation omitted). Accordingly, the *Nuveen* court held that the inclusion of "public entities within the definition of 'person[s]' that may be held liable for securities violations" did not provide a "clear indication" of legislative intent to withdraw immunity. *Id.* at 1124, 1126–27. In reaching this conclusion, the court found it relevant that the plaintiff "cited no legislative history or other authority, and we are aware of none, showing that any particular concern with municipal liability underlay the state securities law." *Id.* at 1127.

Similarly, in this case, there is no evidence that any particular concern with municipal liability motivated the enactment of the Blue Sky Law.[1] Rather, Morgan Keegan relies only on the text of the act. As this language is susceptible to two, inconsistent interpretations with respect to its effect on sovereign immunity, the Blue Sky Law does not permit the conclusion that the legislature expressly intended for this act to waive sovereign immunity.

### B. The Bond Issue Was a Governmental Function

 Morgan Keegan argues that Defendants are not entitled to sovereign immunity because they engaged in for-profit,

and therefore proprietary, functions in connection with the issue of the bonds. "Missouri municipalities are not provided immunity for proprietary functions—those performed for the benefit or profit of the municipality as a corporate entity—but are immune for governmental functions—those performed for the common good." *Southers v. City of Farmington,* 263 S.W.3d 603, 609 (Mo.2008). Thus, the question presented is whether the bond offering was performed for the benefit or profit of the municipality, as opposed to the common good.

Both the Missouri legislature and the Missouri Supreme Court have indicated that this type of bond issue is a governmental function. The Missouri legislature has expressly stated that bond issues such as the offering in this case serve "an essential public and governmental purpose." Mo.Rev.Stat. § 349.090. Likewise, the law concerning industrial development corporations, such as the IDA, begins by declaring that each municipality "shall have the power to spend its funds to promote commercial and industrial development and, in order to achieve such promotion, to engage in any activities, either on its own or in conjunction and by contract with any not-for-profit organization." § 349.012. With respect to the promotion of economic development, the Missouri Supreme Court has specifically held:

> [S]ome form of governmental financing for development serves a public purpose.... The continued existence of an established industry and the establishment of new industry provide jobs, measurably increase the resources of the community, promote the economy of the state, and thereby contribute to the welfare of its people. The stimulation of

---

1. The Court recognizes there is no legislative history in Missouri, but Morgan Keegan offers no explanation as to why the Missouri legislature would intend to obliquely eliminate sovereign immunity in this context.

the economy is, therefore, an essential public and governmental purpose. *State ex rel. Jardon v. Indus. Dev. Auth. of Jasper Cnty.*, 570 S.W.2d 666, 675 (Mo. 1978) (quotation omitted).

Nonetheless, Morgan Keegan argues that the bond issue was a proprietary function because the construction of the sucralose manufacturing and processing facility was a for-profit venture. Morgan Keegan's Third–Party Complaint against Defendants contains no allegations to this effect and this deficiency alone is grounds for dismissal. *See, e.g., Richardson*, 293 S.W.3d at 137. In fact, the Third–Party Complaint alleges that "Moberly offered to 'guarantee' financing to Mamtek with a five-year annual appropriation bond if Mamtek would agree to locate its sucralose manufacturing and processing facility in Moberly." [Doc. # 157 at 3]. This allegation suggests that the bond issue was intended to draw private industry to the area, which the Missouri Supreme Court and legislature have declared to be a governmental function. *See Jardon*, 570 S.W.2d at 675; § 349.090.

Morgan Keegan's additional arguments based on allegations beyond those contained in the Third–Party Complaint also fail to establish that Defendants' performed a proprietary function with respect to the sucralose facility. Citing the Official Statement, Morgan Keegan claims that Moberly would have owned the sucralose facility, the land on which it was built, and any improvements to the facility. However, the Official Statement also makes clear that ownership would have transferred to Mamtek once the bonds were repaid. [Doc. # 25–2 at 20, 26, 30]. Furthermore, Morgan Keegan's reliance on *St. Joseph Light & Power Co. v. Kaw Valley Tunneling, Inc.*, 589 S.W.2d 260, 267 (Mo.1979), in support of its ownership argument is misplaced. In that case, the Missouri Supreme Court held that the con-struction of a sewer system is a proprietary function "because a city so acts in its capacity as a private corporation for the benefit of its residents, and the sewer constructed becomes its property." *Id.* at 267.

The bond issue in this case is distinguishable, as there is no indication that the production and processing of sucralose was intended to benefit the residents of Moberly. *Cf. Parish v. Novus Equities Co.*, 231 S.W.3d 236, 242 (Mo.Ct.App.2007) ("An act of a municipality performed for the special benefit or profit of the municipal corporation, in that it provides local necessities and conveniences only to its own citizens, is classified as a proprietary function."). While a sewer system is constructed for the specific benefit of the municipality, the only benefit that Moberly's residents might have received from the sucralose facility was some degree of economic stimulation, which would not have been confined to their community. As the Missouri Supreme Court explained in Jardon, "[T]he establishment of new industry ... promote[s] the economy of the state, and thereby contribute[s] to the welfare of its people." *Jardon*, 570 S.W.2d at 675 (quotation omitted).

Morgan Keegan also claims that Defendants were intimately involved in the operation of the facility, as they would have participated in the approval of phases of its construction and had the authority to appoint a successor to Mamtek in the event that Mamtek failed. The exercise of some level of oversight over a private company, however, does not on its own compel a finding that the conduct was proprietary in nature. *Cf. Parish*, 231 S.W.3d at 243 (concluding that the conduct at issue was governmental notwithstanding the plaintiffs' allegation that the city had a duty to oversee the privately operated redevelopment project).

Finally, Morgan Keegan's allegations fail to show that the municipality would have obtained any profit or benefit from the construction of this facility, except for job creation and other economic stimulation. In fact, any payments Defendants received as a result of this project were to be used to repay bondholders. [Doc. # 25–2 at 326–27]. Consequently, this case is distinguishable from those cases cited by Morgan Keegan in which the municipality actually operated a business for profit. *Cf. Junior Coll. Dist. of St. Louis,* 149 S.W.3d at 448 ("[W]hen a municipality is in the business of selling water to customers for profit or revenue, it is engaged in a proprietary function."); *Pierson v. Cumberland Cnty. Civic Ctr. Comm'n,* 141 N.C.App. 628, 540 S.E.2d 810, 813–14 (2000) (holding that the leasing of an event center was proprietary where the public entity "charge[d] each promoter a fee for leasing the facility and receive[d] a percentage of the total ticket sales."); *Susla v. State,* 311 Minn. 166, 247 N.W.2d 907, 911 (1976) (holding that the operation of a prison factory that "return[ed] a profit of $66,083.32" in the year at issue was a proprietary activity); *Reierson v. City of Minneapolis,* 264 Minn. 153, 118 N.W.2d 223, 227 (1962) (holding that the operation of "a competitive business enterprise which was expected to provide a financial return that would be of benefit to the municipal corporation" was proprietary). To the extent that Morgan Keegan relies on *Woods v. Homes & Structures of Pittsburg, Kan., Inc.,* 489 F.Supp. 1270 (D.Kan. 1980), that decision involved the application of Kansas law and is unpersuasive in light of the Missouri Supreme Court's decision in *Jardon.*

In sum, accepting all of Morgan Keegan's allegations as true, the only benefit Defendants stood to gain from the bond issue in this case was the general economic stimulation provided by the establishment of a new industry. As the Missouri Supreme Court and legislature have unequivocally stated their view that this is a governmental function, Morgan Keegan's claims against Moberly and the IDA are barred by sovereign immunity.

## III. Conclusion

For the foregoing reasons, Third–Party Defendants the City of Moberly, Missouri and the Industrial Development Authority of the City of Moberly's motion to dismiss the Third–Party Complaint of Morgan Keegan & Co., Inc., [Doc. # 197], is GRANTED. Morgan Keegan's claims against the City and the IDA are DISMISSED, with prejudice.