No. 118,035

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JAYHAWK RACING PROPERTIES, LLC, and HEARTLAND PARK RACEWAY, LLC,
*Appellants*,

v.

CITY OF TOPEKA, KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

The rules of summary judgment are discussed and applied.

2.

Cities are municipal corporations created by law. Thus, cities can only exercise powers conferred by law.

3.

Cities may purchase and hold real and personal property, and make all contracts and do all other acts in relation to the property and concerns of the city.

4.

The powers of the city are exercised by the governing body of the city.

5.

The Legislature has expressly given cities the power to acquire certain property and to issue Sales Tax and Revenue (STAR) Bonds for the financing of STAR bond projects.

6.

Municipal corporations have dual capacities—governmental and proprietary. In the governmental capacity, they serve as an arm of the state and are sovereign. In the proprietary capacity, they exercise powers as any corporation does.

7.

To procure what is needed for public improvements, cities contract with those people and companies that sell what is needed to do the job. When cities act in such a capacity, their actions are proprietary and are governed by the same legal rules that would govern a private corporate transaction.

8.

In deciding whether a city is carrying on a proprietary or governmental function a court must consider whether the activity is for the state as a whole or for a special local benefit; whether the activity arises out of a statutory duty or a privilege that has been granted to it; whether the activity is normally done by private entities; and whether the city's actions were commercial in nature.

9.

The details of financing public projects may, at times, be proprietary and not governmental.

10.

Issuing bonds is not necessarily a governmental function.

11.

Issuing bonds under the permissive authority given to the city by statute to finance the acquisition of real estate, construction of a facility, and leasing of the facility to a private for-profit business constitutes proprietary conduct.

2

12.

   Where general power is given to a city to manage and control property, it has the power to create a contract concerning such property that extends beyond the terms of the members of the governing body of that city if such contract is reasonable and not contrary to a public policy.

13.

   If a contract entered into by a city's governing body involves the exercise of the city's business or proprietary powers, the contract may extend beyond the term of the contracting governing body and is binding on successor governing bodies if, at the time the contract was entered into, it was fair and reasonable and necessary or advantageous to the municipality. If the contract, however, involves the legislative functions or governmental powers of the city, the contract is not binding on successor boards or councils.

14.

   A covenant of good faith and fair dealing is implied in municipal contracts.

15.

   The Kansas Cash-Basis Law makes it unlawful for the governing body of any municipality to create any indebtedness in excess of the amount of funds actually on hand in the treasury of such municipality at the time for such purpose unless provision has been made for payment by the issuance of bonds.

16.

   The Kansas Budget Law provides that creation of indebtedness more than the budget is unlawful unless provision has been made for payment by the issuance of bonds.

3

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Opinion filed November 2, 2018. Reversed and remanded.

*Wesley A. Weathers*, *Patricia E. Riley*, and *Cynthia J. Sheppeard*, of Goodell, Stratton, Edmonds & Palmer, LLC, of Topeka, for appellants.

*Thomas V. Murray*, *Catherine P. Logan*, and *Mark A. Samsel*, of Lathrop Gage LLP, of Overland Park, for appellee.

Before ARNOLD-BURGER, C.J., HILL and BUSER, JJ.

HILL, J.: This lawsuit is an example of what can happen when a municipal government changes directions. Jayhawk Racing Properties, LLC, sued the City of Topeka for breach of contract when the City failed to pay the company, as promised in their contract, almost $2.4 million for its reversionary interest in the land where Heartland Park Raceway is located. When the City refused to issue bonds to pay for the sale, Jayhawk Racing sued, and the City moved to dismiss the action. With the agreement of the parties, the district court treated the motion as one for summary judgment and granted the motion, thus dismissing Jayhawk Racing's lawsuit.

We reverse the court's dismissal, finding the court, in granting summary judgment, ignored the fundamental purpose of the contract—to purchase an interest in real estate. This is a proprietary contract. Simply put, the City was buying all interests in a racetrack. Instead, the district court, in a carefully drafted opinion, improperly limited its view of the contract to a contingency promise made by the City to issue Sales Tax and Revenue (STAR) Bonds. Basically, in dismissing the case, the court ruled the City's promise to finance the purchase with this method of financing was beyond its legal authority. In the court's view, this provision is an illegal attempt by one council to bind future city councils, thus making the entire contract unenforceable. But actually, this contract was more than a promise to finance, and that promise is not the purpose of the agreement. We

4

hold the City was not entitled to judgment as a matter of law. We remand for further proceedings.

After a brief restatement of the oft-repeated rules of summary judgment, we will review the cases that deal with contracts made by local units of government and explore how the old cases hold them to be unique under our law. Some are enforceable, some are not. After that, we examine the contract here and show how the district court, by limiting its review to a contingency promise, mischaracterized this agreement. We hold this is a proprietary contract and the court erred when it ruled otherwise. The questions of good faith and fair dealing and damages remain for future proceedings in district court. We conclude by rejecting the City's alternative arguments on the Cash-Basis Law and the Budget Law.

*The parties agree on the facts.*

Heartland Park is a multi-purpose motorsports facility in Topeka. In 2006, the City issued over $10 million in Sales Tax and Revenue Bonds, known as STAR bonds, to fund improvements to Heartland Park. These STAR bonds allow cities to finance the development or redevelopment of major commercial, entertainment, and tourism districts to stimulate economic growth. When the City issued the STAR bonds, it owned Heartland Park in fee simple for a term of years, subject to Jayhawk Racing's reversionary interest. When the sales tax revenue collected within the STAR bond district was not satisfying the debt associated with Heartland Park, the City became concerned. Thus, the City planned to expand the STAR bond district and acquire Jayhawk Racing's reversionary interest in the land.

*A "Memorandum of Understanding" and "workout agreement" are pertinent.*

In June 2014, the City, Jayhawk Racing, Visit Topeka, Inc., and the Kansas Department of Commerce entered into a Memorandum of Understanding. At its beginning, the parties identified their interests and their aims:

"Whereas, the parties have concluded that it is in the best interest of the City of Topeka, and the State of Kansas for the City to own both the fee simple interest in the property and the reversionary interest owned by Jayhawk; and accordingly the City desires to purchase from Jayhawk all right, title and interest of Jayhawk . . . including the reversionary interest, and Jayhawk desires to sell its reversionary interest . . . .

"Whereas, in connection with the purchase of Jayhawk's reversionary interest and cancellation of the Management Agreement, the City will commence the process of expanding the District, amend the project plan, seek approval of the Secretary of Commerce for the issuance of the additional Star Bonds and issue bonds sufficient to acquire Jayhawk's reversionary interest and pay certain security interests."

We cannot ignore the purpose of this contract was the City's intent to buy the racetrack. The Memorandum of Understanding also listed details of price, method, and timing of payment and a pledge of cooperation:

"3.     Purchase Price. The City agrees to purchase and Jayhawk agrees to sell its reversionary interest to the City for the sum of $2,392,117.00 ('Purchase Price') to be paid on the date of closing.

"4.     Payment, Obligations of Parties. In connection with the above proposed transaction the City agrees to pay, as of the date of closing, the balance of the indebtedness listed in Exhibit B, including principal and interest and associated costs. . . .

"5.     Date of Payment of Purchase Price. The City agrees to pay Jayhawk the purchase price by February 1, 2015 or within 90 days of the approval by the Topeka City

6

Council of the Star Bond Project Plan. In the event of a protest under the provisions of K.S.A. 12-17,169, payment shall be made within 60 days of the approval of the Plan by a majority of the voters of the City of Topeka.

. . . .

"8.  Agreement Contingency. The parties acknowledge that this Agreement is contingent on fulfillment of the current contract between NHRA and Jayhawk and increasing the size of the Star Bond district to include the area shown on Exhibit 'C', the approval of the Secretary of Commerce of the State of Kansas approving the redevelopment project plan for the Heartland Park of Topeka Major Motorsports complex and authorization by the City of the issuance of Star Bonds in an amount equal to the financial obligations set forth in this Agreement including all costs associated therewith. It is estimated that approximately $4.8M-$5.5M of Star Bonds will be issued to cover the acquisition and associated costs of issuance.

. . . .

"10.  Parties Cooperation. The City and Jayhawk agree that they will make commercially good faith reasonable efforts to accomplish the objectives set forth in paragraph 8 of this Agreement in a cooperative manner and the City further agrees to comply with the requirement of good faith and fair dealing."

The Memorandum of Understanding makes it clear that the City's obligation to acquire Jayhawk Racing's reversionary interest in Heartland Park depended on the occurrence of several events, including the approval of the STAR bond project plan by the Topeka City Council and the Kansas Secretary of Commerce, and the City's issuance of STAR bonds.

Along with the Memorandum of Understanding, the City, Jayhawk Racing, CoreFirst Bank & Trust, and others entered into what they called a "workout agreement." This agreement acknowledged that Jayhawk Racing was in default on some loans it had received from CoreFirst, and it required Jayhawk Racing and the City to sign and then place in escrow deeds conveying their interests in Heartland Park to CoreFirst. In exchange, CoreFirst agreed not to collect the loans or record the deeds until February 28, 2015—the anticipated deadline for issuing the STAR bonds contemplated in the

7

Memorandum of Understanding, although the date could be extended with CoreFirst's consent.

In June 2014, the City Council approved both the Memorandum of Understanding and the workout agreement. The City Council passed Resolution No. 8637, which set a public hearing on the City's proposal to amend the Heartland Park redevelopment plan and to issue additional STAR bonds for the redevelopment of Heartland Park.

*The City Council adopts an ordinance approving the plan.*

After a public hearing, the City Council adopted Ordinance No. 19915, providing that the existing STAR bond district "shall be expanded" subject to approval of Shawnee County, and adopted and approved the STAR bond plan for the expanded redevelopment district. The ordinance authorized issuing STAR bonds in the estimated amount of $5 million. The ordinance authorized the City Manager "to apply to the Secretary for STAR bond issuance authority to issue additional STAR bonds in an amount in excess of the amount previously approved by the Secretary in relation to the Project." The ordinance included the required notice of the 60-day protest period. This ordinance has never been formally amended, repealed, rescinded, or vacated by the City.

*The Secretary of the Kansas Department of Commerce conditionally approves issuing STAR bonds.*

The Secretary of the Kansas Department of Revenue approved the City's request to expand the existing STAR bond district and conditionally approved the City's application to issue additional STAR bonds.

*A citizen petitions the City to repeal Ordinance No. 19915 or submit a repeal question to the voters.*

In October 2014, Christopher Imming filed with the City Clerk a petition signed by many residents, seeking to repeal Ordinance No. 19915 or to submit repeal to the voters at a municipal election. In response, the City filed an action in the Shawnee County District Court requesting a declaratory judgment that the Imming petition was an invalid attempt at initiative and referendum. Jayhawk Racing intervened in the litigation. The district court denied the contentions that Imming's petition was technically invalid. But the court did rule in the City's favor by finding that Ordinance No. 19915 is administrative in character and thus exempt from the initiative and referendum law in Kansas. The court also decided that because there is a method in the STAR bond statute for filing a protest petition and obtaining a referendum election on issuing STAR bonds, then Ordinance No. 19915 could not be the subject of initiative and referendum because it was subject to a different kind of election. In other words, this ordinance was one of the statutory exceptions to the initiative and referendum statute.

A panel of this court affirmed the district court, holding that the law permitted a referendum election only when a protest petition was filed and Imming's petition was not a protest petition. See *City of Topeka v. Imming*, 51 Kan. App. 2d 247, 265, 344 P.3d 957 (2015). In April 2015, Imming filed a petition for review with the Kansas Supreme Court and Jayhawk Racing filed a cross-petition for review.

*The City Council passes a resolution to sell STAR bonds.*

Meanwhile, the City Council passed Resolution No. 8658, proclaiming its intent to sell STAR bonds at public sale:

> "That it is hereby determined to be necessary and it is hereby authorized, directed and ordered, that Taxable Full Faith and Credit STAR Bonds, Series 2014-A (Heartland

9

Park), (the 'Bonds') of the City of Topeka, Kansas (the 'City') shall be sold at public sale and in the manner provided by law, on Tuesday, December 16, 2014, at 9:30 a.m. C.S.T. The Bonds shall be in the maximum principal amount of Five Million Dollars ($5,000,000) and shall be dated on or about December 30, 2014."

The remaining sections of Resolution No. 8658 authorized and directed various officers and representatives of the City to take the actions necessary to issue lawfully the bonds. The City was not prohibited by the Imming petition or the later Imming litigation from proceeding with the sale of the bonds, and the City Council was made aware of this fact at its meeting on December 2, 2014.

The City has sold no STAR bonds under the Memorandum of Understanding, City Ordinance No. 19915, or City Resolution No. 8658 at any time.

*After a municipal election, the City decides not to proceed with the STAR bond sale.*

Members of the Topeka City Council are elected to staggered four-year terms. At the regular local election on April 7, 2015, four new members were elected to the City Council. A new breeze was blowing in the City's Council Chambers.

But while the petition and cross-petition for review in the *Imming* case were pending in the Supreme Court, the City Council considered a resolution that would have authorized the City to proceed with the amended Star Bond project plan, including steps toward issuing the STAR bonds. After long debate and taking public comment, the City Council voted 6-4 against the resolution. In other words, the council decided not to proceed with the project. With no new STAR bonds, there would be no funding for the purchase of the reversionary interest in Heartland Park.

10

Eventually, CoreFirst acquired title to Heartland Park by recording the deeds placed in escrow by the City and Jayhawk Racing. On October 7, 2015, the Kansas Supreme Court denied the petition and cross-petition for review in the *Imming* case.

*Jayhawk Racing sues for breach of contract.*

Jayhawk Racing sued the City seeking a declaration of its rights under the Memorandum of Understanding, as well as alleging breach of contract. Later, the City moved to dismiss the first two counts of the petition.

The district court treated the motion to dismiss the first two counts as one for summary judgment and granted the motion. The court held "the City's promise to issue STAR Bonds [in the Memorandum of Understanding] is ultra vires and void and cannot be enforced." The court reasoned that issuing STAR bonds was a governmental, rather than a proprietary function and the City's governing body lacked the power to bind its successors to issue STAR bonds to finance the purchase of Jayhawk Racing's reversionary interest in Heartland Park.

*Jayhawk Racing appeals the dismissal of its claims.*

In its appeal, Jayhawk Racing focuses on three areas. First, the company contends the district court erred when it ruled that Topeka could not be bound to comply with the agreement because it required a good-faith effort to issue STAR bonds to purchase an interest in real property. Second, the Memorandum of Understanding dealt with a proprietary function and not a governmental function and was, thus, enforceable. Finally, in Jayhawk Racing's view, a city can bind itself to act in the future even if that action may occur after the next municipal election.

11

For its part, the City is happy with the court's ruling, maintaining that it correctly held that Jayhawk Racing had no valid claims for a breach of the Memorandum of Understanding since the contract depended expressly on the approval and issuance of STAR bonds—an event that did not happen. The City contends that Jayhawk Racing's claim that the City breached its covenant of good faith and fair dealing cannot prevail when its enforcement would oblige the City to take governmental action. The City has also tacked on two additional claims not made to the district court. In its view, if the Memorandum of Understanding requires the City to issue STAR bonds, it violates the Kansas Cash-Basis Law and the Kansas Budget Law.

We pause here to reflect on the rules of summary judgment. Both parties agree that the district court properly treated the City's motion as one for summary judgment.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue about any material fact and show that the moving party is entitled to judgment as a matter of law. The trial court must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute about a material fact. To preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ about the conclusions drawn from the evidence, summary judgment must be denied. *Armstrong*, 305 Kan. at 24. With no factual dispute, as it is here, appellate review of an order on summary judgment is de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

12

*Units of government must honor their proprietary contracts.*

In democracies, changes in public policy are a fact of life. The law places on local governments, such as the City Council of Topeka, the burden to decide what is good for all in the city. But life and governments are seldom static. What was once thought prudent and profitable can, with experience, or as a result of an election, be considered unworthy—even detrimental. Issues once held to be important, even vital, can fade with the replacement of those who make these decisions. Such changes in the goals of government often come after the elections of those responsible for making these decisions. Thus, an issue seen as vital to one council can become insignificant to the council that follows. Such a change in direction is what happened here.

This constant flux means those who deal with such units of government must be aware of the possibility of dramatic changes in the course taken by city councils and other units of government. Many of the old cases on these issues warn those who do business with local units of government of the very real potential for change.

These cases warn that some contracts will be enforced, some will not.

> "All parties dealing with a sovereign power . . . in the exercise of governmental power . . . do so knowing it cannot contract away the power conferred for self-protection or self-preservation.
>
> "The rule, therefore, that the legislature can pass no law impairing the obligation of contracts does not apply to parties dealing with a department of government concerning the future exercise of powers conferred for public purposes by legislative acts, where the subject-matter of the contract is one which affects the safety and welfare of the public." *Board of Education v. Phillips*, 67 Kan. 549, 552, 73 P. 97, 98 (1903).

Topeka is a municipal corporation. Municipal corporations are creations of law and can exercise powers conferred only by law. *Yoder v. City of Hutchinson*, 171 Kan. 1,

13

8, 228 P.2d 918 (1951). K.S.A. 12-101 expressly states that cities have the power to "[p]urchase . . . and hold, real and personal property," and "[m]ake all contracts and do all other acts in relation to the property and concerns of the city." The powers of the city are exercised by the governing body of the city—here, it is the mayor and city council. K.S.A. 12-103; K.S.A. 12-104.

In particular, cities are expressly given the power "to acquire certain property and to issue sales tax and revenue (STAR) bonds for the financing of STAR bond projects." K.S.A. 2017 Supp. 12-17,160.

Uniquely, municipal corporations have dual capacities—governmental and proprietary. "In one capacity they serve as an arm of the state and partake of sovereignty. In the second capacity they exercise powers as an individual corporation." *Krantz v. City of Hutchinson, et al.*, 165 Kan. 449, Syl. ¶¶ 1-2, 196 P.2d 227 (1948).

By understanding their dual capacities, we can see that these contract cases seem to fall into two categories. The first category focuses on property, the second set looks at policy. The cases distinguish between things and exercise of governmental power. The cases refer to this distinction as proprietary versus governmental contracts. We agree with the district court's observation that these are old cases and the statements within them are sometimes not so clear, but they do point us in the right direction. We look first at proprietary contracts.

In some ways, local governments are like any other consumer. Cities buy materials, tools, equipment, and labor like anyone else. Public improvements are not built from air. To procure what is needed, the local units of government contract with those people and companies that sell what is needed to do the job.

Three cases show proprietary actions. In *Newman Mem. Hospital v. Walton Constr. Co.*, 37 Kan. App. 2d 46, 64, 149 P.3d 525 (2007), a county hospital brought breach of contract and breach of implied warranty claims against architects who designed a medical building. The architects raised a statute of limitations defense. The county argued the construction of the medical building was a governmental function and thus the statute of limitations did not apply. This court found that the construction and lease of a medical building was a proprietary function.

Significantly, the *Newman* court recognized several factors that Kansas courts have used to distinguish a city's activities:

"Factors which have been utilized by Kansas courts in determining whether a governmental entity is carrying on a proprietary or governmental function include (1) whether the activity is for the state as a whole or special local benefit (in our case, the economic benefit of the medical office building flows to Newman and Lyon County); (2) whether the activity arises out of a statutory duty or a privilege granted (in our case, it was a permitted and not a mandated duty); (3) whether the activity is normally done by private entities (in our case, Newman charges market rates and normally makes a gross profit—indicia of a proprietary business); and (4) whether the entity's actions were commercial in nature (in our case, the leasing of a building is a commercial act). These factors all point to requiring a holding that the actions of Newman in this case were proprietary in nature." 37 Kan. App. 2d at 64.

This view was based largely on *Krantz*, cited previously. In *Krantz*, to determine whether the city was immune from suit, the court held that the city's construction of a dike outside the city to divert flood waters from their natural course to prevent flood damage to property within the city was a proprietary function. 165 Kan. at 457.

This view is carried forward to *International Ass'n of Firefighters v. City of Lawrence*, 14 Kan. App. 2d 788, 795-96, 798 P.2d 960 (1990). There the court held that

15

negotiating an employment agreement was an exercise of proprietary or administrative power, rather than governmental or legislative power. The agreement did not concern the general public welfare, but the relationship between the municipality as an employer and its employees. The agreement was binding on the city. We move now to governmental contracts.

Several cases show governmental actions. In *Phillips*, the court determined that the maintenance of public schools is a governmental function. 67 Kan. at 551, 73 P. at 98. Along a similar line, in *Whitlow v. Board of Education*, 108 Kan. 604, 609-10, 196 P. 772 (1921), where the board of education made a contract to sell a tract of school ground, but later changed its mind and rescinded the contract, the Supreme Court affirmed the district court's refusal to compel specific performance of the contract. That case relied on an earlier case, *Construction Co. v. Sedgwick County*, 100 Kan. 394, 396, 164 P. 281 (1917), when the court found:

> "It does not follow that where the controlling body of a public corporation, in the exercise of its judgment as to governmental policy, sees fit to refuse to proceed with a contract to which it has committed itself, preferring to answer in damages for any resulting loss to the contractor rather than to carry out a course which it has determined not to be for the best interests of the community, it can be compelled to perform specifically its engagements by a writ of mandamus."

In other words, it is up to the board of education to determine what is necessary for the education of the children, not the courts.

In more recent times, in *In re Tax Protests of Midland Industries, Inc*., 237 Kan. 867, Syl. ¶ 3, 703 P.2d 840 (1985), the court held that the collection of taxes was a governmental function. In *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 384, 22 P.3d 124 (2001), to determine whether a suit was barred by the statute of limitations, the court held that a quo warranto proceeding seeking ouster of a public official was a

16

governmental function. In *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, Syl. ¶ 9, 648, 941 P.2d 1321 (1997), to determine whether a suit was barred by the statute of limitations, the court held that the investment of KPERS funds was a governmental function because it was necessary to promote the public welfare generally. The increase in funds from KPERS's investments reduces the taxes required to fund KPERS's liability to its beneficiaries.

Importantly, the details of financing public projects may, at times, be proprietary and not governmental. For example, issuing bonds is not necessarily a governmental function. In *Brown-Crummer Investment Co. v. Arkansas City*, 125 Kan. 768, Syl. ¶ 1, 266 P. 60 (1928), the court held valid a contract by the city to deliver bonds to pay for the construction of a sewer. The court wrote:

> "It must be granted that the construction of a sewer being a provision to conserve the
> public health is a governmental or public function rather than a private or proprietary one.
> . . . [But] it does not necessarily follow that the contract for the sale of the bonds to
> plaintiff is subject to rescission or repudiation by the city. The contract for the delivery of
> bonds was something apart from the contract to build the sewer." 125 Kan. at 772-73,
> 266 P. at 62.

The city entered into a contract with a contractor to build a sewer. The city later contracted with the plaintiff, who had agreed to finance the contractor, to deliver the bonds to plaintiff for payment of the sewer. The court found that the contract made with the plaintiff for delivery of the bonds was a different transaction and that delivery of the bonds was not a governmental function, but a private or administrative one. 125 Kan. at 773-74, 266 P. at 63.

Along the same line of reasoning the court in *Woods v. Homes & Structures of Pittsburg, Kansas*, 489 F. Supp. 1270, 1300 (D. Kan. 1980), held that whether the city's acts were governmental or proprietary was ultimately to be made at trial, but that issuing

17

industrial revenue bonds under the permissive authority given to the city by statute to finance the acquisition of real estate, construction of a facility, and leasing of the facility to a private for-profit business constituted proprietary conduct.

In order to illustrate the contrast, we point out that in *Cromeans v. Morgan Keegan & Co., Inc.*, 1 F. Supp. 3d 994, 999-1001 (W.D. Mo. 2014), the Missouri court held that a municipality's issuance of bonds for a project was a governmental function when the legislature expressly stated that the bonds were to serve "an essential public and governmental purpose," the benefit was not limited to the city's residents, and the city obtained no profit or benefit from the construction of the facility, except for job creation and other general economic stimulation. Economic stimulation is "an essential public and governmental purpose." 1 F. Supp. 3d at 999-1000. The court distinguished *Woods* because it involved the application of Kansas law. 1 F. Supp. 3d at 1001.

Then, moving on to secondary sources of the law, McQuillin's Law of Municipal Corporations states that the "right to issue bonds . . . has been characterized as neither a political nor governmental power, but a private corporate power conferred for local purposes." 15 McQuillin Mun. Corp. § 43:20 (3d ed. 2016).

A panel of this court has previously in *Imming* considered whether Ordinance No. 19915 was an "administrative" or a "legislative" matter to determine whether the ordinance was subject to the initiative and referendum petition process under K.S.A. 12-3013(e)(1). The *Imming* court found:

> "[W]e cannot see this as a subject of statewide concern as contemplated by the *McAlister test*. The acquisition of a racetrack by the City is clearly a local concern.
> "We agree with the district court that the centerpiece of Ordinance No. 19915 is the acquisition of the Heartland Park Raceway. This overriding purpose of the ordinance simply outweighs the procedural details that are necessary to obtain STAR bonds. It does

18

not appear that Ordinance No. 19915's administrative characteristics outweigh the general purpose of the ordinance, which is the purchase of a race track.

"We reject the City's (joined by Jayhawk Racing) assertion that simply because this project is to be financed by STAR bonds, then this is automatically an administrative ordinance beyond the reach of initiative and referendum." 51 Kan. App. 2d at 258-59.

That analysis is not flawed and reinforces our view that this is a proprietary contract to buy the racetrack mentioned in the Ordinance listed above.

*We examine the district court's holding.*

The district court focused on the City's promise to issue STAR bonds, stating that "Plaintiffs paint with too broad a brush" when discussing the City's promise to purchase the racetrack. The court then reasoned that issuing STAR bonds was a governmental function because of the express language in K.S.A. 2016 Supp. 12-17,160 et seq., stating that the purpose of the STAR Bonds Financing Act was to benefit the general and economic welfare of the state as a whole, and issuing STAR bonds is something only a government can do.

But the transaction described in the Memorandum of Understanding contains both governmental and proprietary elements, thus we take a broad view of this action at issue. See *Reimer & Koger*, 262 Kan. at 666-67. The Memorandum of Understanding was a purchase agreement. The City agreed to purchase Jayhawk Racing's reversionary interest in the racetrack and pay off its debts. The purchase was part of a plan that included increasing the size of the existing "STAR bond district" to divert state and local sales tax revenues from the businesses in the expanded district to pay off the original and new STAR bond debt, and to save Heartland Park from foreclosure. While it is true that the parties recognized that their agreement was contingent on the City getting necessary approval to expand the STAR bond district and issuing STAR bonds to pay for the

19

acquisition, we see no real distinction between these facts from those in *Brown-Crummer Investment Co.*

*We now look at Jayhawk Racing's second issue.*

Jayhawk Racing contends that its agreement with the City is enforceable even though it bound the City to future good-faith efforts because it did not deprive the City of its ability to exercise any of its core governmental functions either now or in the future. The City contends that the City Council could not bind a later City Council to issue STAR bonds and purchase Jayhawk Racing's reversionary interest because each City Council must have absolute discretion. The City contends that "the ability of the City's taxpayers to elect new council members that might approve a course of action different from that contemplated in the [agreement] is the cornerstone of the democratic process." We are not so convinced. That argument seems to lead us to a conclusion that no contract with a city could ever be enforced if a new council wanted to repudiate it. The cases do not seem to adopt such a view.

We note some fundamental principles at this point. "Where general power is given to an administrative board to manage and control property it has the power to make a contract concerning such property extending beyond the term of the members thereof, if such contract is reasonable and not contrary to public policy." *Fisk v. Board of Managers*, 134 Kan. 394, Syl. ¶ 1, 5 P.2d 799 (1931) (upholding contract where Board leased farm to plaintiff for five-year term to supply milk to a state soldiers' home). The term would exceed the term of those on the city council.

Kansas courts have often upheld contracts that extend beyond the term of the governing body's members when the contract was in the interest of the public health and welfare, and the courts have held such contracts invalid only when the contract interfered

20

with the governing body's ability to protect the public health, safety, and welfare. The cases below are in chronological order.

*We review the cases that have examined the enforceability of municipal contracts.*

We begin with *Phillips*, where the owner of bonds issued by the school board sought an injunction restraining the school board from issuing additional bonds to purchase a site to build a school as authorized by a current act of the Legislature. The owner argued the school board was contractually obligated not to issue bonds until the outstanding bonds were paid in full. The court found that the "maintenance of public schools is an exercise of governmental power in the interest of public morals and the general welfare of the people." 67 Kan. at 551, 73 P. at 98. The court found that "the plaintiff in purchasing the bonds did so knowing that the board could not contract away its power to exercise in the future the authority conferred upon it by the state for the administration of its public affairs." 67 Kan. at 553, 73 P. at 98. Supervision of the public health and public morals by the government is continuing in nature and "'are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them.'" 67 Kan. at 553, 73 P. at 98.

Next, we consider *State, ex rel. v. Linn County*, 113 Kan. 203, 213 P. 1062 (1923). In December 1922, the board of county commissioners entered into contracts for the construction of three bridges. In January 1923, there was a change in board membership and the new board declared that the contracts were not binding. The bridges were to be situated on a highway, part of a federal-aid road improvement project. Without much analysis, the court held that there were situations and types of contracts that would not be binding on the new board, but it was "quite obvious" that a contract of this character was binding on the county and the board of county commissioners "as a continuing body representing the county, notwithstanding any changes in its membership." 113 Kan. at

21

211, 213 P. at 1066. Obviously, in that case one board bound following boards by signing an enforceable contract.

Again dealing with roads, the court in *Verdigris River Drainage Dist. v. State Highway Comm.*, 155 Kan. 323, 125 P.2d 387 (1942), held that the board of county commissioners had authority to bind the county beyond the term of office of the board members to a contract to maintain a floodgate draining a county road. "Were it not so no comprehensive program of road building could ever be carried out." 155 Kan. at 331. The court said:

> "'[I]f a board of county commissioner[s] has express power to make a particular contract at any time during its term of office, a contract made by such board, in accordance with the law, a short time before the expiration of its term of office is not contrary to public policy, and, in the absence of fraud, is valid and binding upon an incoming board of commissioners, although it extends far into their term of office. The ground upon which this rule is based is that a board of county commissioners is a continuously existing corporation, and, consequently, while the personnel of its membership changes, the corporation continues unchanged. Its contracts being the contracts of the board and not of its members, it follows that those contracts extending beyond the term of service of its then members are not invalid for that reason. It has been said that to hold contracts invalid because part or all of a board cease to exercise public functions would be to put these corporations at an enormous disadvantage in making the contracts which are essential to the safe, prudent, and economical management of the affairs of a county. The members of a board of county commissioners cannot, however, contract in reference to matters which are personal to their successors.'" 155 Kan. at 330.

Similarly, in *Edwards County Comm'rs v. Simmons*, 159 Kan. 41, Syl. ¶ 6, 151 P.2d 960 (1944), the court looked at whether the contract commitment was reasonably necessary for the protection of public property:

"In determining the question of validity of a contract made by a board or other governmental agency extending beyond the official term of the contracting board or officials, one test generally applied is whether the contract is an attempt to bind successors in matters incident to such successors' administration and responsibilities, or whether it is a commitment of a sort reasonably necessary for protection of the public property, interests or affairs being administered. In the former case the contract is generally held to be invalid and in the latter case valid."

We note here that the protection of Heartland Park was an express interest of the Topeka City Council when it signed the Memorandum of Understanding.

Then, the *Simmons* court held that a contract between the county board of commissioners and an attorney to represent the county in litigation that would span the terms of several boards was binding on later boards of commissioners. 159 Kan. at 54-55, 151 P.2d at 968-69.

The district court relied upon *State, ex rel. Hawks v. City of Topeka*, 176 Kan. 240, 270 P.2d 270 (1954). In *Hawks,* Topeka, by ordinance, authorized issuing revenue bonds to pay for the acquisition, improvement, and other costs of two parking sites. The city contracted with Park and Shop, Inc. to lease certain parking facilities to be later acquired by the city for the operation, management, and control of the city-owned parking lots. The lease was to run for 30 years and gave Park and Shop the first right and option to re-lease the parking facilities under the same terms after the lease's expiration. The contract also provided that if any of the parking facilities were destroyed or damaged beyond use, the city would rebuild or restore the premises.

The *Hawks* court held that a city could not bind its successors to lease to Park and Shop *all future acquired parking facilities*. 176 Kan. at 252. Additionally, the court ruled that the present governing body could not bind future bodies to rebuild and repair the facilities in that way. The future governing body may decide that the facilities no longer

23

serve a public use and it would not help to repair. Ultimately, the court held that the contract was invalid. 176 Kan. at 252-53.

Again, dealing with streets, the court in *State, ex rel. Cole v. City of Garnett*, 180 Kan. 405, 408-09, 304 P.2d 555 (1956), held valid the board of county commissioners' grant of an easement to the city to widen the street around the courthouse. It rejected any objection that the easement tied the hands of future boards of commissioners.

The court in *Landau v. City of Leawood*, 214 Kan. 104, Syl. ¶ 5, 108, 519 P.2d 676 (1974), held that a covenant by a private sewer company limiting the amount that could be charged to users of the sewer system was unenforceable. It could not be enforced against the city that later acquired the sewer system because enforcement would render it impossible for the city to operate the system that was essential to the health, safety, and welfare of the community.

A contract that extended beyond the term of the county commissioners concerning the disposal of solid waste was held to be valid by the court in *Zerr v. Tilton*, 224 Kan. 394, 400, 581 P.2d 364 (1978). The court held that a contract between the county and a private individual for the collection of solid waste was valid because solid waste disposal was an ongoing problem that vitally concerned the public health and welfare.

Police powers cannot be contracted away by a local government. In *Red Dog Saloon v. Board of Sedgwick County Comm'rs*, 29 Kan. App. 2d 928, 930-31, 33 P.3d 869 (2001), the Sedgwick County Board of Commissioners entered into a contract with Red Dog Saloon, agreeing that it would repeal a resolution that prohibited nudity in establishments which served alcohol, and the contract would bind its successors accordingly. The court held that the Board lacked authority to enter into a contract that effectively contracted away exercise of its police powers or bind its successors accordingly.

24

For a quick review, we note that the *Phillips* case supports the City's position. The government must supervise the public interest "'as the special exigencies of the moment may require.'" 67 Kan. at 553, 73 P. at 98. That case recognizes that a government entity may need to change course if the public interest so requires. But *Verdigris River Drainage Dist.* supports Jayhawk Racing's and Heartland Park's position. If the City Council members could not bind future members to act in good faith to obtain approval to purchase property and issue STAR bonds, then no comprehensive STAR bond project could ever be carried out. See *Verdigris River Drainage Dist.*, 155 Kan. at 330.

As stated above, the test found in *Simmons* is still usable. A contract that "is an attempt to bind successors in matters incident to such successors' administration and responsibilities" is invalid, but a contract that "is a commitment of a sort reasonably necessary for protection of the public property, interests or affairs being administered" is valid. 159 Kan. 41, Syl. ¶ 6. Here, the contract's purpose was to prevent foreclosure of Heartland Park and to provide economic benefit for the City. Under the *Simmons* test, the Memorandum of Understanding is a valid contract.

If we look at secondary authority, the test found in McQuillin guides us to look at the subject matter of the contract:

> "If the term of the contract in question extends beyond the term of the governing members of the municipality entering into the contract, the validity of the contract is dependent on the subject matter of the contract. The general rule is that, if the contract involves the exercise of the municipal corporation's business or proprietary powers, the contract may extend beyond the term of the contracting body and is binding on successor bodies if, at the time the contract was entered into, it was fair and reasonable and necessary or advantageous to the municipality. However, if the contract involves the legislative functions or governmental powers of the municipal corporation, the contract is not binding on successor boards or councils." 10A McQuillin Mun. Corp. § 29:103 (3d ed. 2018)

Under this test, if the City was acting in its proprietary capacity, the contract is valid.

*We distinguish the cases relied upon by the district court.*

The district court found that *Red Dog*, *Landau*, and *Hawks* dictated its result. All three cases are distinguishable. First, *Red Dog* is distinguishable because in that contract the city tried to limit the exercise of its police power—a core governmental function. Here, the agreement involved no police powers. Next, *Landau* is distinguishable because there it was shown that enforcing the contract would render it impossible for the city to operate its sewer system. Again, this centers on the city's need to provide for the public welfare—another governmental function. Here, the City has not shown how enforcing its agreement with Jayhawk Racing would harm the public welfare.

We find *Hawks* to be distinguishable from this case and certainly not controlling. First, *Hawks* deals with the operation and repair of public parking facilities—city assets. The contract here is for the purchase of the complete title and interest in a racetrack. Put simply, the first contract deals with the *management* of a public asset, the second deals with the *acquisition* of a public asset. Second, the parking garage contract is an ongoing enterprise while the acquisition of Heartland Park is a single event. The party, Park and Shop, may prove to be deficient in the future in making repairs to the city's asset, its parking garage. Addressing such an issue would be up to the future city council in that event. Therefore, it makes good sense that the contract which tied the hands of future councils for 30 years would be ruled invalid.

The district court also cited two out-of-state cases. In *Marco Dev. Corp. v. City of Cedar Falls*, 473 N.W.2d 41, 42-43 (Iowa 1991), the Iowa Supreme Court found that a city could not contractually obligate itself to widen a street because the proposed street widening was a governmental function. In *Pippenger v. City of Mishawaka*, 119 Ind. App. 397, 88 N.E.2d 168 (1949), the city contracted with a railroad company to vacate

26

and close 10 public streets that crossed the railroad's path without cost to the railroad and the city agreed not to assess the railroad's property for any of the benefits derived from the closing of the streets. The Indiana appellate court held that the contract was void. The city could not contract away its statutory duty to assess the benefits to the railroad's land or surrender its discretion in the performance of a public duty. The city must "retain its freedom of judgment up to the very moment it was required to act so that its decision when finally made would be influenced only by a regard for public welfare." 119 Ind. App. at 403. We do not find those cases helpful.

Both *Marco* and *Pippenger* contrast with the *Linn County*, *Verdigris River Drainage Dist.*, and *City of Garnett* cases where Kansas courts upheld contracts for road improvements. "Were it not so no comprehensive program of road building could ever be carried out." *Verdigris River Drainage Dist.*, 155 Kan. at 331. *Pippenger* is also distinguishable because there, the city agreed not to assess the railroad's property in violation of a statutory duty. Here, the City did not contract away a statutory duty.

The City contends that the agreement with Jayhawk Racing contracts away the City's "discretion to manage its financial affairs and control its budget by demanding more favorable interest rates, repayment terms, or other provisions before STAR Bonds with the City's full faith and credit backing would be issued and approved" thus contracting away the City's "'power conferred for self-protection and self-preservation.'" We do not read that language into the contract as the City does. We remain unpersuaded.

We see no language in the contract that limits the City's right to demand more favorable interest rates, repayment terms, or other terms on the STAR bond issuance. The City has only agreed to refrain from acting unreasonably or in bad faith. The City agreed to "make commercially good faith reasonable efforts" to obtain the approvals to expand the STAR bond district and issue the bonds, and agreed to abide by a duty of "good faith and fair dealing."

The City also contends that it could not contract to "make commercially good faith reasonable efforts" to take governmental action or impose on itself a duty of "good faith and fair dealing" because these concepts are for private contracts. But if the City was acting in its proprietary capacity, rather than its governmental capacity, then the City is held to the same standard as a private corporation. And McQuillin's Law of Municipal Corporations states that a covenant of good faith and fair dealing is implied in municipal contracts. 10A McQuillin Mun. Corp. § 29:124. Here, the City cannot escape the fact that it was buying a racetrack. In our view, buying a racetrack is proprietary, not governmental.

We have taken a broader view of this contract than the district court. Following the guidance of the cases, we look at the subject matter of this contract and not just how the contract might be financed. The City wanted to buy all remaining interests in Heartland Park and contracted with Jayhawk Racing to do so. Therefore, we conclude this contract deals with property, not policy.

The district court erred when it confined its view of this agreement to a contingent promise of possibly selling STAR bonds to finance this purchase. That portion of the agreement did not transform this contract into policy or a governmental function such as the exercise of policy powers. A city may decide to embrace a public project or abandon it. When it changes direction, however, that does not mean all contracts previously made concerning that project are rescinded.

*This agreement fits an exception to both the Cash-Basis and Budget Laws.*

The City, in the alternative, contends that the Memorandum of Understanding violates the Kansas Cash-Basis Law, K.S.A. 10-1101 et seq. The Kansas Cash-Basis Law makes it unlawful "for the governing body of any municipality to create any indebtedness in excess of the amount of funds actually on hand in the treasury of such municipality at

28

the time for such purpose." K.S.A. 10-1112. Any contract that violates the Cash-Basis Law is void. K.S.A. 10-1119.

The City also contends that the agreement violates the Kansas Budget Law, K.S.A. 79-2925 et seq. The Kansas budget law provides that creation of indebtedness more than the budget is unlawful. Any such indebtedness is void. K.S.A. 79-2935.

But there are exceptions to both laws. One exception is that payments made with the proceeds of bonds do not violate either law. K.S.A. 2017 Supp. 10-1116(a) provides: "The limits of indebtedness prescribed [under this act] may be exceeded when: . . . (2) provision has been made for payment by the issuance of bonds." K.S.A. 79-2935 provides: "indebtedness may be created in excess of the total amount of the adopted budget of expenditures for the current budget year only when . . . provision has been made for payment by the issuance of bonds." According to the Memorandum of Understanding, the City's financial obligations in the agreement depended on issuing STAR bonds. Thus the agreement does not violate either of the laws, and neither of these claims support the grant of summary judgment to the City.

Reversed and remanded for further proceedings.